**MUSKAT et al. v. SCHMELKES.**

Patent Appeal No. 4806.

Court of Customs and Patent Appeals.

Jan. 3, 1944.

Rehearing Denied March 6, 1944.

Parry & Miller, of Washington, D. C. (Edmund H. Parry, Jr., of Washington, Pa., and Olen E. Bee, of Pittsburgh, Pa., of counsel), for appellant.

H. Frank Wiegand, of New York City (Edwin R. Hutchinson, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

From a decision of the Board of Interference Examiners of the United States Patent Office awarding to Schmelkes priority in four counts corresponding to claims taken from three Muskat and Chenicek patents, Muskat and Chenicek have here appealed. The counts all define a product, and since we are not concerned here with the differences in the breadth of the counts, count 1 is illustrative and reads:

"1. Chlorinated melamine characterized in that a substantial amount of the chlorine in said chlorinated melamine is present as active chlorine."

The invention relates to chlorinated melamine, which is a nitrogen compound ordinarily obtained in the form of a powder, the melamine forming the carrying agent for the chlorine, which is capable of being liberated for the purpose of oxidizing, bleaching, sterilizing, or for bactericidal reactions. The most important utility of the compound in controversy is for the purpose of destroying bacteria in liquids, such as milk and drinking water.

In the chemical art it is not new to chlorinate a product in varying amounts to accomplish the purposes sought by the appellants and the appellee in their Patent Office activities. Many different chemicals may be chlorinated to some extent. Ap-

pellee, in describing the invention of his application, has the following to say:

"This invention relates to halogen derivatives of amides and imides of cyanuric acid and the method of making such derivatives. The invention relates, particularly, to N-chloro *derivatives* [sic] of melamine."

Schmelkes describes the compound as a germicidal or detoxifying agent, while Muskat and Chenicek refer to it as a sterilizing agent and also a bleaching agent.

It is shown in the record that there are numerous amines which are susceptible of being chlorinated and that some of them, by reason of their capability of carrying large amounts of chlorine and other characteristics, have found utility in the arts in which the involved compound is designed to be used. Melamine belongs to a smaller class of amines concerning which chemists had considerable knowledge with respect to the possibility of their utilization in the art involved here.

The counts, as before stated, correspond to claims from three of appellants' patents, the application for the first of which was filed in December of 1937. Appellants' patents issued in December of 1939. Appellants took no testimony and are confined to December 1937 for conception and reduction to practice. Appellee filed his application in August of 1940, a little more than eight months after appellants' patents issued, and he was therefore under the burden of proving his priority beyond a reasonable doubt. This he undertook to do by evidence of certain experiments which he alleges resulted in two reductions to practice—one in 1932 and another in 1933.

The Board of Interference Examiners held that appellee had satisfactorily proved that the experiments made at Schmelkes' request by two chemists of whom he was in charge amounted to a complete reduction to practice. It accordingly awarded priority to appellee upon this holding.

Appellants argued before the board and argue here that the said experiments in 1932 and 1933 did not amount to a reduction to practice and that the fact that eight years passed before appellee, after being advised of appellants' patents, finally filed an application in which appellants' claims were copied as aforesaid creates a strong presumption that the early activities were unsuccessful. They also argue that all the

circumstances show that appellee did not complete his invention and that whatever was accomplished amounted to nothing more than an unsuccessful and abandoned experiment.

 The rule relating to the question of abandoned experiments is well settled in patent law and has many times been stated by this court. In Bennett v. Fitzgerald, 48 F.2d 917, 920, 18 C.C.P.A., Patents, 1201, this court, in holding that the proof was insufficient to show a reduction to practice where there had been delay in filing the application for patent, cited and quoted from the case of Paul v. Hess, 24 App. D.C. 462, in which the following was said:

"Long delay in making use of an invention claimed to have been reduced to practice, or in applying for a patent, have always been regarded as potent circumstances tending to show that the alleged reduction to practice was nothing more than an unsatisfactory or abandoned experiment. * * * And this is specially the case where, in the meantime, the inventor has been engaged in the prosecution of similar inventions * * *, or others, without reasonable explanation, have been adopted for manufacture and commercial use."

It seems that the complete rule applicable to this case is stated in the Hess case, and there is no necessity for citing many similar holdings by this court. In order that we may determine whether the above-quoted principle applies to the instant case and controls decision thereof, we feel required to state the facts somewhat in detail, although there are so many facts and circumstances, some of which have only a minor bearing upon the question involved, that we would not be justified in lengthening the opinion by stating them all.

Schmelkes was the Assistant Director of Research at Wallace & Tiernan Products Company, the assignee of his application. In 1931 he started out on an extensive program involving the preparation and study of a great many N-chloro compounds in order to find which of them were most capable of serving as carriers for as much chlorine as possible. He stated in his testimony:

"We have prepared, in this laboratory, a long series of chlorinated amines of which chlorinated melamine is only one, whenever it was possible for us to prepare a chlorinated amine that was a *stable*, solid material." [Italics ours]

At that time he knew that melamine was difficult of procurement and prohibitive in price for most practical purposes. Nevertheless, he secured 100 grams of melamine from Eastman Kodak Company in 1932 at a cost of $8.50. That was at a time when he, as stated by his assistant, Dr. Glass, was chlorinating "every organic nitrogen compound we could get our hands on." This sample of melamine was turned over to Glass, a research chemist, for experimentation in chlorination, and in the month of March 1932 Glass conducted four experiments wherein he subjected melamine to a chlorinating agent. He made reports on these tests as follows:

"Chlorination of Melamine

"Melamine (6.3g) was treated with 111 cc neutral NaOCl (3 molecules) at room temperature. There was no gas evolution or odor of nitrogen chloride. Solution was not complete after $\frac{1}{2}$ hour stirring.

"Treatment of the same quantity of melamine with twice the amount of NaOCl resulted in solution at once to a clear red solution and no gas formation. This solution was divided into two parts; the first evaporated in vacuum and the second made slightly acid with dilute HCl,—a yellow precipitate forming. This was filtered, washed with cold water and dried. Analysis: 26.54% Cl. This was designated as Cl No. 12.

"The material obtained from the red solution was a dirty, sticky solid and was discarded.

"A small sample of melamine was suspended in water and chlorine gas passed into the cold solution. After three hours the white precipitate was filtered, washed with cold water and dried in vacuum. Analysis: 31.57% Cl. Calculated for $C_3N_6H_4Cl_2$; 36.41%. This material was recrystalized from acetone and again analyzed: 37.47% Cl. This product was designated as Cl No. 10.

"The chlorination with chlorine gas was repeated using no cooling as above. The product was worked up in the same way and found to contain 44.12% Cl. An attempt was made to recrystalize this material from acetone but it was found to be too soluble. Addition of water to the solution gave an oil which on solidification and drying was found to contain 33.8% Cl and was discarded."

There is no testimony on his part that he or anyone else determined whether or

not the chlorinated melamine was stable in character. Schmelkes asserted, without corroboration, that one of the products produced by Glass was turned over to a laboratory technician, Miss Romans, and tested a few days later for its action in killing bacteria in milk, and that the tests were successful. Exhibit 17 is said to be the report of the results of these tests. The exhibit comprises pages taken from Schmelkes' notebook or record book. This testimony is not relied upon by Schmelkes for any purpose except that stated by his counsel in the brief, as follows:

"* * * This testimony by Dr. Schmelkes himself is not cited to establish that the test for bacteria was a reduction to practice. The invention had already been reduced to practice by Glass, Schmelkes' agent, and the law does not require that it must have been tested to kill bacteria to constitute reduction to practice. We cite the testimony to show that before his subsequent reduction to practice in 1933, Schmelkes actually knew that chlorinated melamine would kill at least some kinds of bacteria."

Eleven months thereafter, in February 1933, Schmelkes assigned Dr. Marks, another assistant, to subject melamine to a chlorination process. A small bottle of this chlorinated material was sent to Dr. Gump at Trudeau Sanitarium, Trudeau, New York, who was then engaged in a study of chemical therapeutic agents for the treatment of tubercular patients. Dr. Gump's testimony has no relevancy to the question of reduction to practice and was introduced only for the purpose of showing that at that time there had been no concealment of the invention.

The board held that the record fairly showed that the invention of Schmelkes had not been concealed or suppressed, which made inapplicable the doctrine of Mason v. Hepburn, 13 App.D.C. 86, and there is no contention here by anyone that the doctrine of that case does apply. These activities of Marks are urged by Schmelkes as being a second reduction to practice of the subject matter of this controversy.

Almost four years thereafter, in 1936, during which period there appears to have been no activity for reasons which appellee attempts to explain and which will be referred to hereinafter, Lang of Rare Metal Products Company requested Schmelkes to furnish him some azochloramid or whatever other chlorinated compounds Schmelkes might suggest for experimentation by Lang to determine whether they would be good as retarding agents in the vulcanization of rubber. Schmelkes sent Lang a small bottle labeled "N–chloro N–N' dichloro melamine 59.8 per cent av cl₂ November 24, 1936." Whatever Schmelkes' testimony may disclose with reference to the melamine content of this bottle, there is no corroboration by any witness which has any bearing upon the question of reduction to practice, and this testimony again is, as far as we are able to observe, emphasized by appellee only to refute any contention relating to suppression or concealment which might be made and to show that Schmelkes had not lost interest in chlorinated melamine.

Lang and his associate Wilson filed application in 1937 for a patent for the use of chlorinated melamine and other similar compounds in the method of treating rubber, and on September 5, 1939, they received a patent therefor, No. 2,171,901.

About two and a half years after the Wilson and Lang application had been filed, Schmelkes received a letter, dated January 17, 1940 (appellants' patents, it will be remembered, were granted in December of 1939), from American Cyanamid and Chemical Corporation which referred to a request by Schmelkes for a sample of melamine. That letter stated:

"We are in receipt of your request received through our representative, Mr. J. B. Darlington, for a sample of Melamine.

"This is a product in which we are very much interested and we are in the process of constructing a plant to manufacture it in substantial quantities. Production from this plant will not be available, however, for perhaps five or six months. When it is available, we will be in position to offer you not only trial lots but substantial quantities if you are then interested.

"Our experience has shown that pilot plant production of this material is unsatisfactory and prohibitively expensive. At the present time we do not have enough material to justify us in sending out even sample quantities, although we have had a great many requests. If you want a small quantity I think perhaps you can get it from the Eastman Kodak Company.

"We most certainly are making a record of your interest in Melamine and as soon as this product is commercially available, we will be sure to get in touch with you."

On August 21, 1940, Lang returned to Schmelkes the remainder of the bottle purportedly containing chlorinated melamine which Schmelkes had sent to Lang in 1936. Schmelkes had an assistant test this chlorinated melamine for available chlorine content, and the analysis showed 56 per cent available chlorine.

Ten days later Schmelkes filed his application for patent.

The sole excuse Schmelkes offered for delaying the filing of his patent application until over eight years after the first alleged reduction to practice in 1932 was that melamine was too expensive to be utilized in making a commercially salable product, and that it was the universal policy of the company for which he worked not to file applications for patents on inventions until it was ready to place the patented articles upon the market in commercial quantities.

Under the rule above quoted from the Hess case, we are here called upon to determine whether, under all the facts and circumstances of record, it should be held that Schmelkes, in the manner stated, had reduced his invention to practice as early as 1933 or whether the long delay in filing his application for a patent, together with the other facts and circumstances detailed herein, justifies a conclusion that whatever he did prior to the filing date of appellants amounted only to an abandoned experiment.

In the first place, the testimony relating to the experiments of Glass and Marks as to the determination of the chlorine content of the melamine is not regarded as strongly indicating that either they or Schmelkes were convinced from such experiments that they had found a material which answered the requirements of a suitable compound for the purposes in mind. Lang's use of the melamine which he obtained from Schmelkes was for an entirely different purpose—viz., as a retarder in the vulcanization of rubber. Neither Schmelkes nor anyone associated with him tested the material at that time for stability. Schmelkes' testimony above referred to in connection with Exhibit 17 was, as before stated, wholly without corroboration. Exhibit 17 does not disclose that Schmelkes at that time knew anything about the stability of the compound which he claims to have invented. In testifying concerning this exhibit, Schmelkes had the following to say:

"I kept this book in my own office; and I pretty well hounded the technicians to be certain to keep this book up to date. This book was more or less an indication as to whether the work in our chemical laboratory was successful and as to along which lines it should be continued and prosecuted. If we had a compound that was of particular interest from the point of view of bacteriological tests, we would—It is to be noted that at this point in Schmelkes' testimony, his counsel stopped him with the statement—

"'That is enough, I think.'"

We think that Exhibit 17 and Schmelkes' testimony relating thereto cannot, for reasons which are obvious, be relied upon by the appellee as tending to support his claim to priority. On the contrary, it seems to us that the subject-matter would indicate that the reason for Schmelkes' failure to make proper tests and file an application for patent was that he was not convinced that the chlorinated melamine had the desired utility.

Appellee, in his brief, calls attention to the fact that after testing the chlorinated melamine, some of which he sent to Lang, Lang also tested it and found it to be useful as a retarder in the vulcanization of rubber. Schmelkes urges that this fact and the fact that Wilson and Lang took out a patent on their discovery and in their specification disclosed the use of chlorinated melamine show that the appellants were not the first inventors of the article covered by the counts at bar. It may be that in some other proceeding it could be determined that the article called for by the counts involved was old in the art before the appellants filed their applications, but we cannot see how this fact can be helpful to Schmelkes if he lost interest in the article and failed to reduce it to practice by making the test which we herein hold was essential to its reduction to practice. There is no contention here by Schmelkes that the tests made by Wilson and Lang in the rubber vulcanization art inure to his benefit in supplying proof of tests which the record fails to show he made.

The portion of the testimony of Dr. Gump relied upon for the purpose of proving no concealment has a particular significance itself. He stated, in substance, that he tested all the compounds which Schmelkes sent him, and that they were

tested as bactericides and were known to contain free available chlorine. The first that he received and tested was azochloramid. He was asked which was the best of the compounds so tested and replied, "Well, the azochloramid was the best one." While this testimony could not be accepted as corroboration of Schmelkes' testimony as to the character of the material sent to Gump, it seems that it might throw some light upon the question as to why Schmelkes failed to make certain tests and file his application for a patent.

In the interval between the 1932 and 1933 experiments and the year 1937, Schmelkes applied for six patents relating to chlorinated compounds, but not one word about melamine was mentioned. It is shown by the record that melamine did not become available in sufficient quantities and at a price low enough to warrant its extensive use in commercial production until after the issuance of appellants' patents. As before stated, Schmelkes relies upon this as his sole excuse for not filing application for patent until after the issuance of the patent of Wilson and Lang and the patents of appellants.

It is not without interest to note here that Lang must have known of the scarcity of this product, but nevertheless he became interested in the material after obtaining the sample which Schmelkes still had on hand and tested and experimented with the same, and he found that it was useful in the rubber vulcanization art. Notwithstanding its scarcity, which the record indicates continued at least until 1940, he promptly filed, in 1937, his application for patent.

Appellee contends that in order to show a reduction to practice by Schmelkes it was not necessary to show tests for stability or value as a germicidal agent because the counts say nothing about stability or the use to which the material is put, and that appellants are seeking to have this court construe the counts so as to insert limitations which are not even suggested by the language of the counts. We do not so understand appellants' position. We think their contention when boiled down—and we agree with it—briefly is that before one is entitled to an award of priority based upon an actual reduction to practice, it must be disclosed satisfactorily, especially where, as in this case, the proof must be beyond a reasonable doubt, that the inventor so tested his product (if of the character requiring tests) as to bring conviction at least to him that the product has utility within the meaning of the patent laws and is of such value as to warrant a patent grant.

Schmelkes states in his application the following:

"The derivatives are quite stable. One preparation made in 1936, analyzing at that time 106% of available chlorine, was retested in 1940 and found then to contain 96% of available chlorine; the loss of chlorine is inconsiderable as compared with the known instability of most N-chloro compounds."

The test for stability referred to in appellee's application was made after the issuance of appellants' patents, and in order to show patentable utility in his product appellee emphasized in his application the stability of the product. It seems strange, to say the least, that Schmelkes should feel called upon to make a test of this character after the issuance of appellants' patents and before filing his own application if long before this date, in 1932 and 1933, he had satisfactorily ascertained the qualities of the compound in this particular.

In January of 1940 Schmelkes was informed by American Cyanamid and Chemical Corporation that within five or six months substantial quantities of melamine would be available for his use if he was interested. Notwithstanding this fact, Schmelkes made the test last above referred to and delayed until August 31, 1940, before filing his application for patent. This circumstance would seem to indicate that Schmelkes had not, in 1932 and 1933, satisfied himself that he had produced an article which was an improvement over that which was old in the art or that it had patentable utility. Under the circumstances, it seems to us that Schmelkes cannot rely upon the unavailability of substantial amounts of melamine or the high cost thereof as an explanation for his long delay in filing his application. By this holding we do not mean to suggest that the unavailability of a material in substantial quantities or its high cost is a matter which may never be taken into consideration in explaining away the presumption that follows a long delay in filing an application for patent. However, we think that all the facts and circumstances of record in

the instant case make applicable the principle announced by this court in Tinnerman v. Kost, 129 F.2d 725, 728, 29 C.C.P.A., Patents, 1259, where we said:

"* * * It taxes credulity to believe that any inventor with the experience of appellant would have allowed his devices made in 1932 and 1937 to rest without endeavoring to secure patent protection thereon until 1939. The only reason in our opinion that appellant's application was not filed long prior to 1939 is that he did not consider the device had been so reduced to practice as to be worthy of patent protection, and regarded it as an abandoned experiment. * * *"

The same reasons Schmelkes alleges prompted him to delay eight years in filing his application would also seem to explain why he failed to go to the trouble of testing his chlorinated melamine for stability. It is not illogical to conclude that when he had completed his experiments in 1932 and 1933 he was of the opinion that since in any event he would not file an application for patent on account of the unavailability and high cost of melamine, there was no necessity of further testing and developing the questions relating to its utility.

A product which would be unstable would not be of sufficient utility to be of interest to Schmelkes when he was seeking a better chlorinated compound than those already well understood and in commercial use. Therefore, we believe that the chlorinated melamine which Schmelkes claims to have produced belongs to that class of articles which require tests more comprehensive than those given by the appellee.

Schmelkes supports the position taken by the board that the utility of a compound containing chlorine was well-known and that, his experiments having shown the active chlorine content of his compound, it would follow from this determination that a "degree of utility" at least would be inherent. The cases of Corona Cord Tire Company v. Dovan Chemical Corporation, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610, and Kyrides v. Bruson, 102 F.2d 416, 26 C.C.P.A., Patents, 986, are cited as authority for the soundness of this contention.

It must be remembered that the problem confronting Schmelkes was to find some carrier which would render the compound stable and serve for the purposes desired. The facts in this case are not on all fours with the Kyrides and Corona Cord Tire Company cases, supra, for reasons which would seem obvious. There are certain kinds of articles which, when made, are fully reduced to practice without the necessity for any tests because their utility in the art to which they belong is thoroughly understood. We have in mind the decision of this court in Larson et al. v. Eicher, 49 F.2d 1029, 18 C.C.P.A., Patents, 1497, where we held that there was no necessity of determining the therapeutic qualities of cod liver oil tablets because their therapeutic utility was generally understood.

Neither are the facts in the instant case on all fours with the holding in Mason v. Hepburn, supra, where a complete reduction to practice had been made of a gadget and there was no possibility that it would not operate as intended. In the instant case, if melamine was of such character that when it had been chlorinated it would not be stable or if for any other reason the compound was of no use, it of course would not be a patentable article. We think, therefore, it should have been tested in the respect indicated. In this view we are supported by the case of Whitehead v. Diamond, 97 F.2d 604, 25 C.C.P.A., Patents, 1357, where this court held certain experiments insufficient to show reduction to practice because they did not show whether the yarn in question was stable in its delusterable characteristics.

In view of the statement in appellee's application and the other considerations to which attention has herein been directed, we think the reason offered by the board for holding that a determination of the active chlorine content by tests would be sufficient and that "it would follow that a degree of utility would at least be inherent" was an erroneous conclusion.

It is our view that appellee has not proved beyond a reasonable doubt that he had reduced his invention to practice prior to the said filing date of the appellants, and that the decision of the Board of Interference Examiners awarding priority to appellee was erroneous. Its decision accordingly is reversed.

Reversed.