47 CCPA

Imre J. HEGYI

v.

Ernst ALBERS–SCHOENBERG

v.

Pieter GELDERMANS and Pieter Van Den Ban.

Patent Appeal No. 6496.

United States Court of Customs and Patent Appeals.

July 20, 1960.

Radio Corporation of America, A. Russinoff, Princeton, N. J. (LeRoy Greenspan, Princeton, N. J., of counsel), for appellant.

Russell G. Pelton, Orville N. Greene, Frank Lowell Durr, New York City (Benjamin Sweedler, New York City, of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges,

and Judge WILLIAM H. KIRKPATRICK.[1]

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences of the United States Patent Office awarding priority of the subject matter of the sole count in interference No. 87,849 to Albers-Schoenberg (called "Schoenberg" herein), a junior party, in his application serial No. 442,534, filed July 12, 1954.

Appellant Hegyi, the senior party who filed application serial No. 317,878 on October 31, 1952, alleges error in the board's decision granting priority to Schoenberg on the basis of his earlier application, serial No. 270,351, filed February 7, 1952, as a constructive reduction to practice of the subject matter of the count.

Geldermans et al., also a junior party (serial No. 461,850 filed October 12, 1954), received an adverse decision below on a motion to dissolve as to Hegyi, filed in response to an order to show cause. Geldermans et al. appealed to this court but that appeal was dismissed at the request of Geldermans et al. and they are no longer a party to this appeal.

The invention disclosed in the applications relates to certain ferromagnetic ferrite cores, which, when composed of magnesium, manganese and ferric oxides in certain proportions and prepared by well known methods, have a "square" or substantially square hysteresis characteristic. Cores exhibiting this characteristic possess desirable magnetic properties, two of which are: a high remanant flux and a high rate of change in flux as the core switches between opposite polarity states of saturation. These properties make the cores particularly useful for magnetic switches, magnetic amplifiers, coincidence circuits and memory circuits for computers.

The count did not originate in any of the applications involved but was drawn by the examiner to cover overlapping subject matter which was being claimed by the parties. It reads:

"A ferromagnetic ferrite body having a substantially square hysteresis loop formed by firing a mixture of magnesium, manganese and ferric oxides in the proportions of about 8–27 mol % magnesium oxide, 33–65 mol % manganese oxide and 30–47.5 mol % ferric oxide."

Hegyi, the senior party, took no testimony, relying on his filing date, October 31, 1952, as the date for a constructive reduction to practice. Schoenberg relied on several earlier applications and in addition took substantial testimony to establish an actual reduction to practice. However, since the board relied on the disclosure of Example E in Schoenberg's earlier application, serial No. 270,351, in awarding priority to Schoenberg, Hegyi's appeal must fail if the board was correct on that issue, the date of serial No. 270,351 being over eight months prior to Hegyi's filing date.

Appellant contends that serial No. 270,351 cannot constitute a constructive reduction to practice because Example E is not within the count which requires that the ferrite body have a "substantially square hysteresis loop" and because the earlier application fails to show that Example E has utility for the disclosed purposes.

Obviously, then, we must look to the specification of serial No. 270,351 to see what it discloses to one of ordinary skill in the ferrite art. It says:

"This invention relates to the production of ferromagnetic ceramic bodies which have hysteresis loops of substantially square or rectangular shape and to the bodies so produced.

"Among the objects of the invention is to provide a ferromagnetic material having hysteresis loops

---

1. United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge* O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

which approach very closely to a square or rectangular shape.

\* \* \* \* \* \*

The terms rectangular or square hysteresis loop or square loop ferrites require some explanation as these are terms which has [sic] been adopted to describe a hysteresis loop which only approaches the square or rectangular shape and the ferrite material which has such a hysteresis loop. \* \* \*

\* \* \* \* \* \*

"Magnetic materials having these properties have found particular applications in computor and magnetic memory systems. In general, the function of square loop cores in such a system operates as follows:

"The core material is magnetized and then excitation removed so that the magnetic state of the core is at retentivity (Br) or at remanance [sic]. If a current pulse of short duration and suitable polarity is then applied which is large enough to drive the material in the opposite direction, a voltage output on a separate winding can be taken off due to the change of flux in the core. By arranging a set of these magnetic cores in some kind of array, basic mathematical operations can be performed."

In describing the "desirable properties" which substantially square loop ferrites exhibit, Schoenberg in serial No. 270,351 states:

"1. The Br/Bs ratio should be as close to unity as possible. If the hysteresis loop were absolutely square or rectangular the ratio would be unity but this ideal ratio is practically unattainable. For purpose of this specification the loop is considered to be rectangular or square if the Br/Bs ratio is 0.8 or more.

"2. The hysteresis loop should be steep, or the differential permeability dB/dH should be large.

"3. The corners of the hysteresis curve should be sharp. In use, the sharp cornered materials give an effect similar to the sudden snapping in a mechanical switch."

As to Example E, particularly relied on by Schoenberg in that its composition falls squarely within the ranges of the count, the application says that Example E is represented by point 15 [1] in the triaxial diagram of the drawing and that it "still shows some squareness although the corners are markedly rounder than those of the previous given compositions." Figs. 2 and 3 are triaxial diagrams, one in weight percent and the other in mol percent, each having certain enclosed areas which will be referred to later. The application states that "Fig. 2 is a triaxial diagram of composition in the system MgO, MnO, $Fe_2O_3$ which are suitable as square loop materials \* \* \*." While the application indicates that the best materials for present applications are within the field 1–2–3–4–5, it goes on to say:

"The complete range of the useful square loop materials is included within the outline marked by the dot-

[1] "The body according to point 15 contains:

"MgO          3% by weight [10 mol percent]
"MnO$_2$       34% by weight [45 mol percent]
"Fe$_2$O$_3$   63% by weight [45 mol percent]

"The properties are:

"Saturation flux density (Bs)     3560 gauss
"Residual magnetism (Br)          2760 gauss
"Br/Bs                             .77
"Coercive force (Hc)              .97 oersteds
"Maximum permeability            1450
"Initial permeability             185"

ted lines connecting the points 7–8–4–9 and 10."·

This area includes Example E labeled as point 15. Apparently as a result of its low magnesia content, Example E would have a somewhat slower and perhaps undesirable, response time. However, the application says that this shortcoming is offset by a gain in saturation flux density and other properties which we note to be a lower coercive force and higher initial permeability.

█ The board resolved numerous issues, some of which have been raised on appeal. Example E, however, was held to be a constructive reduction to practice of the subject matter of the count, the board relying on Den Beste v. Martin, 252 F.2d 302, 305, 45 CCPA 798, and cases cited therein, for the proposition that in an interference, an "earlier application disclosing only one species or example * * * defined in a generic count constitutes a constructive reduction to practice of the invention defined by that count." (Of course, the application disclosing the species must be an allowable application.) The board found that the proportions of Example E of the earlier application, which are identical with Example 5 (original designation) of the involved application, fall squarely within the ranges of that count. If this one issue was correctly decided, appellant cannot prevail.

Appellant does not deny that Example E meets the range limitations of that count but argues that it does not have a "substantially square hysteresis loop," as is also required by the count. This is so, he says, because the ferrites of the count are "substantially exclusively useful as memory elements" (our emphasis) and because Schoenberg's earlier application limits the ferrites that can be so used to those having a Br/Bs of 0.8. Even if this be so, the earlier application states that Example E has a Br/Bs of 0.77 which obviously is "substantially" 0.8. Furthermore, closer inspection of what the earlier application discloses, as quoted above, indicates that Schoenberg considered Example E to be a material having a substantially square loop. Perhaps he did think it was not the "best" composition, but he did disclose recognition of the fact that it showed squareness, that it was within the area on the triaxial diagram which includes the useful square loop materials, and that certain disadvantages in the low magnesia compositions, as in Example E, are offset by improved effects in other properties.

█ Arguments that Example E could not have been used in a memory circuit of a computer overlook the breadth of the count. An interference count must be given the broadest interpretation that it will reasonably support. Here the count is for a ferrite body having a substantially square hysteresis loop and being composed of ingredients falling within prescribed ranges. It is not limited to use in a magnetic memory of the coincidence current type, or in a magnetic switch or even as a magnetic core. No particular use or operative connections are required. It is a broad count drawn to an article. This broad subject matter of the count is the subject matter priority of which is to be determined.

The issue of right to make the count in the applications involved in the interference is not raised here, but it was raised below with respect to Hegyi's right to make the count and we think the following statements by the examiner in his decision on motions, dated April 15, 1957, are relevant to construing the scope of the count.

"* * * it is evident that Hegyi compositions would have the squareness ratio since *the ranges disclosed would inherently produce such a configuration.*

*        *        *        *        *        *

"* * * in view of the preamble of the count, it is held that the ferrites defined in the present count are identified by composition and its *inherent* properties, namely— 'square or rectangular hysteresis loop'. (Emphasis ours.)

The count does not recite any specific degree of squareness and the examiner held that the "substantially square hysteresis loop" was inherent in the compositions of the count. For the foregoing reasons it is our opinion that Example E falls squarely within the count.

Were we to look at Hegyi's application we would note that nothing therein tells us what Hegyi considers "substantially square" to mean. Hegyi's application, after describing the testing procedures, defining the ratios that indicate the "measure of rectangularity" and disclosing the results of tests on numerous compositions, states:

> "It is obvious that any of a large number of different compositions comprising a solid solution in $MnFe_2O_4$ will provide a material having a high degree of rectangularity of its hysteresis characteristic."

Hegyi not only fails to tell us what constitutes "a high degree of rectangularity" but goes on to say that the selection of a particular composition for a particular application will depend upon the application, giving certain qualitative properties that it might "be advantageous to select."

In this priority contest, Hegyi is relying solely on the disclosure of his application which discloses no more as to utility and how to use than does the earlier Schoenberg application. The previously quoted portions of Hegyi's disclosure indicate that one skilled in the ferrite art would choose a particular composition depending on the properties required for a given application. The same criteria are applicable to Schoenberg. Compare Blicke v. Treves, 241 F.2d 718, 44 CCPA 753. We can find no adequate reason for limiting Schoenberg as appellant would have us do, to a date when he is proved to have had possession of a specific composition, narrower than the count, having specific properties suiting it for specific use in computers.

Example E of serial No. 270,351, which falls within the count, is carried over as Example 5 in the application involved, thus providing continuity. Manifestly Hegyi is not entitled to a claim which reads squarely on the prior disclosure of Schoenberg's Example E and Schoenberg is therefore entitled to the award of priority.

The decision of the Board of Patent Interferences is affirmed.

Affirmed.