**Alda V. BEDFORD, Appellant,**

v.

**Wilson P. BOOTHROYD and Edgar M. Creamer, Jr., Appellees.**

**Patent Appeal No. 6904.**

United States Court of Customs and Patent Appeals.

June 20, 1963.

Richard E. Lyon, Los Angeles, Cal. (A. Russinoff, Princeton, N. J., of counsel), for appellant.

Allen V. Hazeltine and Fordyce A. Bothwell, Philadelphia, Pa., for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

Appellant has appealed from a decision of the Board of Patent Interferences, adhered to on reconsideration, which awarded priority of invention to the appellees. The appellant, Alda V. Bedford, is the junior party whose application,[1] assigned to the Radio Corporation of America (hereinafter referred to as RCA) was filed February 11, 1950. The appellees, Wilson P. Boothroyd and Edgar M. Creamer, Jr., assignors of Philco, are the senior party by virtue of their application [2] filed January 21, 1950, twenty days prior to appellant's.

The present appeal requires us to review the decision of the Board of

---

1. Ser. No. 143,800. This application matured into U. S. Patent No. 2,728,812, issued December 27, 1955.

2. Ser. No. 139,928.

Patent Interferences and to answer two questions.

(1) *Was the Board of Patent Interferences correct in holding that Bedford did not prove a conception prior to October 5, 1949, and*

(2) *Was the Board of Patent Interferences correct in holding that Bedford failed to prove continuous diligence during the critical period.*

The invention in issue relates to a "dot sequential" color television system and particularly to a system of synchronizing a receiver and transmitter color sampler. There are three counts in issue. Count 2 is as follows:

"2. A color television transmitter comprising in combination a plurality of sources of video signals each of which simultaneously represents the intensity variation of a different color, a sync generator adapted to provide pulses at line deflection frequency, a time division multiplexer having a single output and a plurality of inputs, each of said inputs being coupled to one of said sources of video signals and adapted to successively conduct each of said video signals to the single output of the multiplexer, a sampling oscillator having a frequency that is appreciably greater than line deflection frequency, the output of said sampling oscillator being coupled so as to maintain the frequency of successive periods of conduction of said time division multiplexer appreciably greater than line deflection frequency, a gating device coupled to the output of said sampling oscillator, means for rendering said gating device operative to intermittently supply signals from said sampling oscillator in response to the pulses of line deflection frequency supplied by said sync generator, and means to combine the multiplexed video signals, pulses of line deflection frequency and the in-

termittent signals supplied by said gating device."

In the "dot sequential" system of color television, a number (usually three) of continuous video signals are created at the transmitter. These signals individually represent the intensity of the different color components (e. g., red, green, blue) of the image being telecast. These individual signals are combined ("sampled") by an apparatus called a "time division multiplexer" to form a single video wave which, *at successive instants,* represents the intensities of the component colors. At the receiver, the combined wave is broken down ("desampled") into the original individual components. The desampling in the receiver must be carefully synchronized in both phase and frequency with the sampling done in the transmitter in order to faithfully reproduce the colors of the image being telecast. The invention defined in the counts is concerned with synchronizing the receiver desampler and the transmitter sampler.

In the signal system defined by the counts, a short burst of several cycles of color synchronizing signals is transmitted in addition to the customary horizontal and vertical deflection synchronizing signals and the video signals. The short "burst" is located in the composite signal so that it will not interfere with the video or deflection synchronizing signals. Thus, the burst is transmitted at a time when no video or deflection information is being transmitted. This time is identified in appellant's brief as follows:

" * * * More specifically, the counts define apparatus for placing each burst on the 'back porch' of the horizontal blanking signal. This is the interval which follows the horizontal deflection signal and during which no picture or deflection information is being transmitted.

"At the receiver, these burst signals are separated from the composite signal and used to control the phase and frequency of a receiver sampling oscillator. This oscillator

controls the sampling of the received color information signal."

Both parties took testimony, the total of which amounts to over two thousand pages of printed record. Bedford, the junior party, submitted (1) testimony to show a conception with due diligence of the invention of the counts prior to any conception by the senior party and (2) testimony to show an actual reduction to practice prior to the senior party's filing date of January 21, 1950. Bedford conceded in his brief that Boothroyd et al. conceived in October 1949 and reduced to practice (constructively) on January 21, 1950. Boothroyd et al., the senior party, concedes that Bedford *conceived* the invention of the counts as of December 22, 1949 on the basis of his Patent Disclosure Sheet, but argues that Bedford's testimony failed to prove an earlier conception. Therefore, the appellant Bedford can prevail by proving a conception of the invention defined by the counts prior to October 1949 and continuous diligence from a time just prior to October 1949 until a reduction to practice, actual or constructive, hereinafter termed the critical period.

The Board of Patent Interferences held that Bedford's testimony failed to show by a preponderance of evidence a prior conception plus continuous diligence during the critical period and a reduction to practice prior to Boothroyd et al.'s filing date. The sole issue to be decided here is whether the board was correct in so holding.

The board opinion outlines the activities of Bedford and RCA during 1949 and 1950. It is here quoted at length to supply the factual background of this appeal:

"The subject matter arose in the course of attempts to devise a system of dot sequential color television. The acts and activities of the parties took place in 1949 and early 1950 against the background of the imminence of the calling of hearings on color television by the FCC (Federal Communications Commission), and the extended hearings which

formally opened on September 26, 1949 and formally closed on May 26, 1950. * * * Subsequent to the 1947 FCC action CBS had improved its field sequential system and in May, 1949 and on July 6, 1949 demonstrated it before special groups, which the editor of Color Television Standards states 'convinced the majority of those who observed it that the field sequential system was capable of rendering excellent images, within the 6 mc limitation, so far as color fidelity was concerned.' Dr. George H. Brown of RCA testified that he saw such a demonstration in May, 1949. In June, 1949, RCA determined to build a dot sequential color television apparatus for demonstration, the work to proceed under the direction of Dr. Brown. * * *

* * * * * *

"The envisaged dot sequential system could be seen to require some way of keeping an oscillator at the transmitter 'in step' with an oscillator at the receiver, which means that receiver oscillator must be held, within very close tolerances, to the same frequency and phase as the oscillator at the transmitter otherwise the picture will be bad. In both RCA and Philco there were discussions of at least more than one way of attempting to do this. Dr. Brown of RCA testified very definitely that Bedford talked with him in June, 1949, about the possibility of inserting a few cycles of transmitter oscillator * * * output (referred to as a 'burst') on the sync pulse pedestal just following the horizontal sync pulse (this position being often referred to as the 'back porch') to be utilized at the receiver to control or correct sampling synchronization. * * *

* * * * * *

"Returning now to the priority aspects we find that RCA had proceeded in this manner. Within a few days before July 8, 1949 Brown

had divided the work to be done on the projected color television system into a number of assignments. A sheet in evidence as Bedford Exhibit L, dated 7/8/49, is a list of assignments by ordinal, title, and personnel. Assignment 1 is 'Derivation of Sampling Pulses from Horizontal Pulses A. C. Schroeder, E. Robinson.' Assignment 7 is 'Theory Group' with personnel including A. V. Bedford. Assignment 13 is 'Derivation of Sampling Pulses by other means than (1) L. A. Barton.'

\* \* \* \* \* \*

"Burns and Werenfels were assigned to assist Barton, and Barton put Burns on the problem of building the transmitter portion of the burst system, which they came to call a 'burst maker' and put Werenfels on the problem of building the receiver portion of the system. By the end of July, Burns had completed a burst maker and made a circuit diagram of it. While Burns was on vacation Barton made another burst maker designated No. 2. Werenfels completed a 'burst user' intended as a receiver part and made a circuit diagram of it on August 22, 1949. Thereafter other burst users were constructed by Burns and by Burns and Keizer, the latter joining the work in late November. On a day in December, said to be the nineteenth although there seems to be a little uncertainty as to the exact day, a test or demonstration was conducted using a flying spot scanner to develop a picture signal, burst maker No. 2 with some transmitting equipment, and a color receiver having in it the circuit of Bedford Exhibit HH which was the 3rd burst receiver made, further modified by the reduction of tube complement from 13 to 12. The output of the transmitter equipment, whatever it all was besides what we have specifically mentioned, was channeled to the receiver in another room.

"On December 22, 1949, Bedford signed a 'Patent Disclosure Date Sheet,' Bedford exhibit A, which was received by the RCA patent department the next day."

The board held that Bedford had not proven a conception prior to October 5, 1949, the date of conception conceded to Boothroyd et al. In so holding, the board stated that:

" \* \* \* Obviously Bedford suggested the principle involved on or before July 8, 1949, but the disclosure he made to Barton cannot be determined from Barton's testimony to include or specify the construction of means recited by the counts, so that what is established as conveyed in that interchange fails to qualify as a conception of the invention defined by the counts under the cases from Merganthaler v. Scudder, 1897 CD 724 to Bac v. Loomis [252 F.2d 571], 45 CCPA 807; 117 USPQ 29. Barton, however, testified that he considered that he could supply out of his knowledge and experience the means required to embody the principle disclosed to him, and he did immediately set to work to build some apparatus. But the 'burst makers' that were built in July and August 1949, did not include elements of the counts (we refer to circuit diagrams Bedford exhibits N and O). A source of intelligence signals or video signals was not present, nor was a multiplexer, nor a means for combining the output of a multiplexer and blanking pulses. Supposing that these elements were all supplied for the purpose of the November-December demonstrations, there is a time uncertainty here as to when Barton, or Burns, or both visualized or reduced to diagram the complete arrangement, bearing in mind that Bedford must be accorded conception before October 5 to have the possibility of pre-

vailing. There is then also the doubtful question of whether either what Barton et al. had in mind or put on paper can be said to be what Bedford had in mind when at the necessary time for Bedford to be credited with conception it had not been communicated to him by Barton et al. Conception is in a different category from reduction to practice in this respect, since reduction to practice of an invention already conceived is a physical task which a principal may do by means of an agent, whereas conception of an invention is the thinking of original thoughts. One person may hire another to think original thoughts but the thoughts do not become the thoughts of the employer merely because of the prearrangement. * *

(1) *Was the Board of Patent Interferences correct in holding that Bedford did not prove a conception prior to October 5, 1949?*

The inventor Bedford testified that he had conceived the invention as early as June 28, 1949 and disclosed it to others "early in July 1949." Bedford stated that he did not prepare the Patent Disclosure Sheet, Exhibit A, until December of 1949 because he had been under "the erroneous impression that someone else [at RCA] had invented this device before me."

Bedford's testimony of conception as early as July of 1949 is corroborated by the testimony of Dr. Brown, who was in charge of all color television activity at RCA at this time. Dr. Brown testified as follows:

"Q9. When did you first hear of such a proposal?

"A. Of the proposal for the burst?

"Q10. Synchronization, which you have just described.

"A. In June, 1949.

"Q11. Would you explain—

"A. Yes.

"Q12. —under what circumstances?

"A. Well, early in May, in 1949, I went to Atlantic City and saw a demonstration of field sequential television, closed circuit color television, put on by the Columbia Broadcasting System at the American Medical Association convention, and Al Bedford went with me to that convention, and at that time we talked a good deal about our color activities here and the work on time division multiplex, and we discussed the problems of controlling the phase, controlling the time relationships, and I discussed those with Bedford then and continuing, and I believe it was late in June, 1949, that he sketched for me the burst on the 'back porch', to be the same frequency as the sampling frequency, and we talked about the means for doing it, speculated about the number of cycles that might be used and the fact that this would give us a key or control in the receiver, that would give us automatic hue control."

Bedford also testified that he had disclosed the invention in July 1949 to Loy Barton whom Dr. Brown had assigned to investigate and develop a satisfactory color synchronizing system. This testimony is corroborated by Barton as follows:

"Q22. Referring to the first page of Exhibit A, immediately above your signature there appears the notation: 'The invention was first explained to me by the above identified inventor(s) on July 8, 1949.'

"Who inserted the written material in that notation, to wit, July 8, and the '49?

"A. I did.

"Q23. Would you explain your reasons for making that insertion and the basis on which it was made?

"A. Yes. Mr. Bedford asked me to sign, sign this disclosure, and this was the date that I found was

the date at which he disclosed the burst system to me.

\* \* \* \* \* \*

"XQ476. Now, Mr. Barton, what part or feature of the apparatus of page 1 of Cross-Exhibit P represented the thing which had been taught to 'you by Mr. Bedford?

"A. The burst on the 'back porch' of the sync pulse, the burst of high frequency for synchronizing purposes.

"XQ477. Did Mr. Bedford tell you how to go about obtaining that burst?

"A. I don't remember that he did, but it wasn't necessary because I had had considerable experience with such—such devices, placement of pulses, and so on. All he needed to do was to tell me, give me the general idea.

"XQ478. In other words, to suggest to you that a good way to provide synchronization would be by a short burst of the high frequency oscillations on the blanking pulse or pedestal or following after the synchronizing pulse? Could you tell us what he did convey to you?

"A. He conveyed the idea of putting a burst of frequencies of fairly high frequency, in the order of four megacycles, a burst of frequencies on the space back of sync pulse, still on the blanking pulse, and when that was conveyed, why, that was all that was necessary for him to really tell me.

"Just how much more he told me I don't know, but I had knowledge and could build equipment to do the job."

We agree with the statement of the board that "Obviously Bedford suggested the principle involved on or before July 8, 1949," but do not agree that the evidence does not prove that Bedford had *conceived* the invention defined by the counts as of July 1949. The board's position is that even though the evidence established sufficient knowledge of the complete invention in the RCA labs, such knowledge cannot be imputed to Bedford without sufficient proof that Bedford himself had such knowledge. While we agree with this position as stated, we think, however, that the preponderance of direct and circumstantial evidence in the record shows that Bedford had such mental possession of the invention of the counts to constitute a *conception* in July of 1949.

First of all, Barton's testimony quoted above clearly indicates that Bedford's disclosure to him was sufficient to enable him to construct the burst equipment. Second, after Barton had discussed the burst system with Bedford, he disclosed the complete system to two other RCA engineers who had been assigned to him to help develop and construct the burst equipment. The testimony of these two engineers, Werenfels and Burns, clearly indicate that *Barton* disclosed and discussed with them the complete idea of the invention of the counts.[3] We find nothing in the record to indicate that *Barton* himself conceived the synchronizing technique which he communicated to Burns and Werenfels. The originator of the idea seems to have been *Bedford,* who, as pointed out above, discussed and disclosed the idea for the system to Barton. There is no evidence to the contrary.

Further evidence of record indicating that the complete concept of the counts was visualized *by someone* at the RCA labs is a patent issued to Ballard, another RCA engineer, No. 2,678,348,

---

3. Werenfels' testimony in part:

"Q14. Well, what did Mr. Barton convey to you in your discussions as to the nature and equipment that was involved in this new project?

"A. Loy told me that—well, my knowledge at that point was the—the color system with the dot sequential system used sampling oscillator in the transmitter and the sampling oscillator to desample the information, the transmitted information, in the receiver, and the problem was to synchronize the receiver with the transmitter, and the scheme we were to try out, to build and try out, was to put the burst of this sampling frequency on the

filed September 24, 1949, which discloses (but does not claim) the complete invention of the counts. Bedford testified that he disclosed the invention of the counts to a number of people "of the television section early in July 1949." One of the persons mentioned was Mr. Ballard, the patentee.

■ The board, in its well considered opinion, recognized that it could not consider a contention that a party other than Bedford actually invented the subject matter at issue,[4] but stated that:

"* * * The rule however does not relieve a party who must show prior conception from the burden of establishing by corroborating evidence that he was himself *possessed* of the conception at the required time; the rule merely bars certain consequences, for the purpose of the priority determination between the parties to the interference, that might attend the showing that a person not a party was possessed of the conception at a still earlier time. * * *"

We agree with the board's statement and interpretation of this "rule", but conclude that the entire record on behalf of Bedford does establish a conception of the invention of the counts by Bedford in July of 1949. Therefore, the decision of the board as to Bedford's conception is reversed.

(2) *Was the Board of Patent Interferences correct in holding that Bedford failed to prove continuous diligence during the critical period?*

In order to prevail, Bedford must show reasonable diligence in reducing his invention to practice from a time prior to Boothroyd et al.'s conception[5] until Bedford's reduction to practice, actual or constructive. 35 U.S.C. § 102(g). The board stated its conclusion as to RCA's diligence as follows:

"It should also be noted that if Bedford be accorded an earlier date for conception than Boothroyd and Creamer, then Bedford could not prevail without diligence in reducing to practice from just prior to October 5, 1949 to the filing of the Bedford application on February 11, 1950. RCA has contended diligence in continuous activity in the RCA laboratories from late June through

---

'back porch' after horizontal sync pulses during blanking time and use that burst in the receiver to control the sampling, the color sampling oscillator, lock it in with the burst.

* * * * *

"Q16. Well, about when was that, if you recall?

"A. Soon after I started working with him, early in July, middle of July.

"Q17. Well, when did you start working with him?

"A. About the first week in July.

Burns testimony in part:

"Q14. Well, would you explain in some detail just what this system was that Mr. Barton described to you at this time?

"A. This was a system for synchronizing a color television receiver with a color television camera at the transmitter, and this system employed a burst of sampling frequency signal on the 'back porch', on the horizontal blanking period 'back porch', and this burst was transmitted along with the regular color television signal over the air and received by the receiver and picked up, utilized in the receiver for desampling the color information for presentation to the color display device.

* * * * *

"Q20. When did you first learn of the burst synchronizing proposal?

"A. Sometime in July, 1949.

"Q21. And what was the source of your information?

"A. Well, one source was Mr. Barton, of course, and I think that the reason— well, I know the reason I say one source is that the color television was a very common subject of discussion in the lunch room and all over the laboratories, because we were working pretty hard, there was quite a bit of effort on it, and, therefore, I undoubtedly knew the basic principles of the multiplex system before joining Mr. Barton, and the specific assignment and the work on this synchronizing approach was—I did hear. that from Mr. Barton."

4. See, e. g., Mortsell v. Laurila, 301 F.2d 947, 49 CCPA 1028.

5. Conceded to be in October 1949.

December, and in Washington in early January, 1950, *but has presented no evidence of activity between January 11 and February 11, 1950. For this reason alone RCA could not prevail upon an earlier conception date than Boothroyd and Creamer unless also an actual reduction to practice date be accorded prior to January 21, 1950, the filing date of Boothroyd and Creamer.* In that case diligence would drop out as a material element of Bedford's priority case." [Emphasis added.]

Bedford presented testimony and argued before the board that the November and the December 1949 demonstrations each constituted a reduction to practice of the invention of the counts. The board, however, concluded that the evidence failed to show a satisfactory reduction to practice as follows:

"However, the November demonstration was but a stage in the experimentation which proceeded to a test of elaborated equipment, and cannot be regarded as a reduction to practice. The demonstration of December 19, or thereabouts, we are satisfied added or had sufficient transmitter equipment, the details of which however are not shown, to produce a color picture signal from color transparencies and a color receiver was provided to reproduce the pictures. The set-up was still laboratory in nature and was not a television system in operation. There was no motion of the subject and no radio link between the transmitter apparatus and the receiver both of which would if present introduce influences which might disconcert a system. No details of data or observation were presented from which the operation of the synchronization function may be directly deduced or evaluated. Barton and Burns, however, testified that they believed that satisfactory operation was shown. We do not see how the December demonstration can be held to prove

reduction to practice in view of the principles set forth and applied in Elmore v. Schmitt [278 F.2d 510], 47 CCPA [959] 960; 125 USPQ 653."

After careful review of the evidence presented by Bedford, we disagree with the conclusion thus reached by the board.

During October and November of 1949, the record establishes that Burns built a 5 tube receiver synchronizing unit for a television receiver unit. This chassis was installed in a color television receiver and, after installation, was demonstrated to a number of persons. This demonstration, upon which Bedford relies as a reduction to practice, was described by Burns as follows:

"Q326. You have mentioned that several people witnessed these demonstrations. Could you identify from memory who they were?

"A. I was there, and Dr. Luck was there, and Mr. Mesner, and there were several others, but I do not recall who they were at the time.

"Q327. When did these full color demonstrations take place?

"A. Around the middle of November, 1949.

"Q328. How do you fix that date?

"A. I fix that date by reference to the chronological order of the material in my notebook, in that the—we were under considerable pressure to demonstrate this as quickly as possible, and I received the chassis on 7 November '49, and tested it out immediately, and I am estimating that by the time I had obtained a receiver and had it installed it was approximately a week. It certainly was not much longer than a week, which would place it very near the middle of November, '49."

The equipment used in this November demonstration was further described by Burns as follows:

"Q288. Would you describe in a little more detail the receiver in which you incorporated this 5-tube

chassis and the arrangement that you used for the demonstration?

"A. The arrangement for the demonstration consisted of a transmitter burst synchronizing chassis in conjunction with the color pickup device and the transmitting sampler and the horizontal and vertical synchronizing signals obtained from the sync generator. All these signals were combined properly and put on a laboratory type transmitter and fed to the receiver, which was across the hall, and this receiver was a 3-tube projection color receiver that used conventional r.f. and i.f. chassis and receiver sampler and r.d. modulator and conventional red, green and blue amplifiers feeding the three projection color tubes, and synchronizing was, of course, done by the 5-tube chassis to which I previously referred.

"Q289. Would you describe in a little more detail the laboratory type transmitter to which you have referred?

"A. That is just a low power television transmitter on just one— it usually puts out a signal on just one frequency, one channel, and it is modulated with video and the output is fed by means of coaxial cables around to the various receivers under test.

"Q290. Was this radio frequency or video frequency?

"A. This was radio frequency.

"Q291. Well, was that, then, a complete color television system or was there something lacking in the equipment which you used?

"A. *As far as I can see this was a complete color television system. We had a color pickup device picking up the signal to be televised and a complete link, complete receiver, that presented properly colored—a picture properly colored with proper color and proper amplitude of the various components of the scene*

*being televised."* Emphasis added.]

As to the results of the November demonstration, Burns stated:

"Q295. How well did the receiver reproduce the image of the color slides? What I would like is a general description of the results that you obtained.

"A. *The results were—as far as the synchronizing goes—were excellent.* As far as the projection receiver itself, it had limitations well known to projection receivers, in that the light output was not extremely bright, *but the picture was of a satisfactory size and the colors were correct and the contrast was satisfactory, so that it was an entirely successful demonstration of a complete color system."* [Emphasis added.]

The board characterized the November demonstration as "but a stage in the experimentation which proceeded to a test of elaborated equipment". We think the board may have confused the November demonstration with an earlier August 1949 test of a "burst maker" and a "burst user" since the above quoted testimony of Burns clearly indicates to us that the November demonstration was a satisfactory reduction to practice of the complete invention of the counts.

Furthermore, in December 1949, another demonstration of the complete system was made which we think constituted a reduction to practice of the invention of the counts. As to the results of this demonstration, Burns testified as follows:

"Q341. Who attended the demonstration on that Monday?

"A. Mr. Kell, of the television group here at the laboratory, and, of course, Mr. Landon and Dr. Luck, and Keizer and myself, undoubtedly we were all present. I recall Keizer and I recall Landon and myself, and also present were higher executives of the company. Dr. Jolliffe, I believe, was there. There were a

couple of other executives there, too, whose names I am not certain about.

"Q342. What results were obtained in this demonstration?

"A. They were extremely impressed with the system, because here for the first time these higher executives saw a color system that —wherein the color lock between the transmitter and receiver was no longer a problem. *The demonstration was a complete success, and on the spot they adopted the system as the RCA synchronizing method for color television.*" [Emphasis added.]

Keizer also described the December 1949 test as follows:

"In this particular receiver * * the chassis was used in this complete receiver to demonstrate to a number of the laboratory management, including Dr. Brown, Dr. Engstrom and others. In this demonstration we started with a color slide in the television studio here at the Laboratories. The slide was picked up by a flying spot scanner and color signals were derived using the sampler and using a burst. These were used to modulate a megapix. A modulated signal was transmitted to the room in which the demonstration was made, which was several hundred feet away, and the receiver was used to demodulate the r.f., the burst, and was—and the demodulated video was fed to this chassis and to the normal—I would like to strike 'normal'—to the other parts of the receiver that required it, and good color pictures were obtained."

The board noted that in neither of these demonstrations was there a moving image nor was there a radio link between the transmitter and receiver since a coaxial cable, in lieu of transmission via the air waves, was used. Even if we agree with the board's conjecture that motion of the subject "might disconcert a system", we note that none of the counts contains a requirement for a moving image. Thus, the burst system which synchronized color transmission only for motionless images could be a significant contribution since the transmission of still subjects in color has application in commercial or industrial uses. The counts also do not require a "radio link" between the transmitter and receiver. Even if it is assumed that the burst system might be affected by radio link transmission, transmission via coaxial cable, as was done in both the November and December 1949 demonstrations, is applicable to widely used "closed circuit" systems using coaxial cable for transmission of the signal. Thus, the November and December 1949 tests do in fact indicate that the invention of the counts "worked as intended to work in its practical contemplated use" as required by Elmore v. Schmitt, 278 F.2d 510, 47 CCPA 958, cited by the board.

Our conclusion is that the December 1949 test, if not also the November 1949 test, constituted a satisfactory reduction to practice by the junior party. Another fact which further enhances this conclusion is that immediately after the December tests, RCA decided to incorporate the burst synchronizing system in all RCA receivers to be used in the forthcoming FCC demonstrations in February 1950. In view of the importance of having the best color reproduction system available for the FCC hearings in February 1950, it is unlikely that the RCA executives would have adopted the burst system for this demonstration unless the prior November and December 1949 demonstrations had convinced them of its practical use in the complete television system. We therefore find that there was a satisfactory reduction to practice of the invention of the counts in December 1949 by RCA.

As quoted above from its opinion, the board considered the evidence as to RCA's diligence from just prior to October 1949 (Boothroyd et al.'s conception) until Bedford's filing date, February 11, 1950. The board concluded that the record showed diligence by RCA until

January 11, 1950 but concluded that there was no evidence of activity at RCA between January 11 and February 11, 1950. However, since we have found that the December 1949 demonstration constitutes a reduction to practice of the invention of the counts, the critical period extends only to December 1949, (35 U.S.C. § 102(g)), and therefore, the lack of activity between January 11 and February 11, 1950 is immaterial if RCA was reasonably diligent during the critical period.

After careful analysis, it is our conclusion that the record does show, by a preponderance of evidence, that RCA was reasonably diligent in reducing to practice the invention of the counts from a time prior to Boothroyd et al.'s conception in October 1949 until the demonstrations in December 1949 which we find to constitute an actual reduction to practice.

As pointed out above, after Bedford disclosed his concept for the synchronizing apparatus to Barton and others, Barton assigned the task of building transmitter and receiver synchronizing units to Burns and Werenfels in July 1949. A first "burst maker" for use in the transmitter was completed by Burns in "the latter part of July, 1949". In the first part of August, 1949, Burns assisted Barton in building a second "burst maker" which was completed "about the middle of August." Concerning the testing and installation of this second unit, Burns testified as follows:

"A. After testing the chassis and finding that it worked satisfactorily we—that is, Mr. Barton and myself—installed this chassis in a studio rack equipment and assured ourselves that it was working satisfactorily.

"Q155. Well—excuse me, go ahead.

"A. This was done sometime in August, and it was then—the transmitter portion was then completed and available for use.

*    *    *    *    *    *

"Q157. Why was burst maker No. 2 installed with the studio equipment?

"A. Burst maker No. 2 was installed with the studio equipment so that the burst synchronizing signals would be available at the transmitter, as required by the various experimenters in the laboratory."

After completion of this installation, Burns stated that he resumed work on another project unrelated to this appeal because the transmitter portion of the burst apparatus had been completed. Meanwhile, Barton and Werenfels completed their work on the receiver portion in late August 1949. The transmitter and receiver components were tested and found to operate satisfactorily on August 22, 1949 according to the direct testimony of Barton and Werenfels.

The testimony of Dr. Brown shows that the next step was to incorporate the burst system in the RCA equipment which was to be demonstrated at the FCC hearings in Washington. Dr. Brown testified that he assigned Igor Grosdoff to this project "about the first of September". Grosdoff, now deceased, was to work on the transmitter equipment and Burns and Dr. Luck were to develop receiver equipment. Burns testified concerning his assignment that:

"A. Sometime during the month of September I was reassigned from working on mechanical filters to working with Dr. Luck so that I could put full effort on the burst synchronizing system again, since I was already somewhat of an expert on the circuits we had already built."

Later, Burns testified that he completed his assignment as follows:

"Q169. When did you build that receiver chassis?

"A. During the month of—during the months of October and November, 1949."

The completed receiver "burst user" chassis built by Burns was installed in a

color receiver and the November demonstration was made. Concerning this demonstration, made in RCA's Princeton laboratory, Burns testified as follows:

"Q327. When did these full color demonstrations take place?

"A. Around the middle of November, 1949.

"Q328. How do you fix that date?

"A. I fix that date by reference to the chronological order of the material in my notebook, in that the —we were under considerable pressure to demonstrate this as quickly as possible, and I received the chassis on 7 November '49 and tested it out immediately, and I am estimating that by the time I had obtained a receiver and had it installed it was approximately a week. It certainly was not much longer than a week, which would place it very near the middle of November, '49."

After the November 1949 demonstration at Princeton, Burns stated that he continued to work on the synchronizing chassis and awaited the results of the FCC demonstrations which were held on November 21, 1949 in Washington. Burns indicated his actions after the Washington demonstration as follows:

"Therefore, as soon as these demonstrations were over we put forth extreme effort to—to revise the burst synchronizing system and apparatus such that there would be no possibility of it not being the chosen system. We obtained the support of additional engineering help and proceeded to build a more refined equipment."

In December 1949, the refined synchronizing chassis was completed by Burns, Keizer and Landon and demonstrated in the latter part of that month to a number of RCA engineers and executives. This demonstration of the complete system of the counts constituted an actual reduction to practice.

It is our conviction that the above summarized testimony shows that RCA was continuously diligent throughout the critical period.

In summary, we hold that the junior party Bedford conceived the invention of the counts in July of 1949 and was continuously diligent in reducing this invention to practice from his conception until the actual reduction to practice in December 1949.

The board apparently concluded that Boothroyd et al.'s proofs established conception of the invention of the counts on October 5, 1949, a time later than that which we accord to Bedford. Boothroyd et al. have not argued in this appeal that their conception was earlier than October 5, 1949 and state in their brief that they "found it unnecessary to prove any date for conception earlier than October 5, 1949".

Therefore, the decision of the board is reversed.

Reversed.