44 C.C.P.A.(Patents)

**Frederick F. BLICKE, Appellant,**

v.

**Gino R. TREVES, Appellee.**

**Patent Appeal No. 6230.**

United States Court of Customs
and Patent Appeals.
Feb. 8, 1957.

Laurence, Wiest & Sherman, Washington, D. C. (Dean Laurence, Jackson, Miss., and Margaret Laurence, Washington, D. C., of counsel), for appellant.

Burgess, Ryan & Hicks, New York City (Richard K. Stevens, Washington, D. C., of counsel), for appellee.

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH and JACKSON, retired, Judges.

WORLEY, Judge.

This is an appeal from the decision of the Board of Patent Interferences of the United States Patent Office awarding priority of invention of the subject matter involved to the senior party, Gino R. Treves, appellee here. The issue of the interference is defined in the following counts:

"1. The acid addition salt of beta-(diethylamino) ethyl ester of 2-phenyl-2-(1-hydroxycyclopentyl) ethanoic acid."

"3. The acid addition salt of beta-(diethylamino) ethyl ester of 2-phenyl-2-(1-hydroxyclyclohexyl) ethanoic acid."

The appellee is involved in the interference on two patents issued May 29, 1951, and June 26, 1951, respectively. The applications on which those patents were granted were filed May 20, 1949, and, since Treves did not take testimony, he is restricted to that date for conception and constructive reduction to practice. Blicke's application was filed March 15, 1951.

Blicke's testimony was held by the board to establish that he produced the compounds recited by the counts and subjected them to various tests in 1948. The evidence in that respect is summarized in the following excerpt from the board's decision:

"The party Blicke relies essentially upon asserted actual reductions to practice in the year 1948, well prior to his opponent's filing date to be overcome. It is undisputed that a compound corresponding to each count was prepared on behalf of Blicke during that year. During the same ear extensive pharmacological tests were carried out for the purpose of evaluating the compounds as antispasmodics. The first test involving the compound of count 3 was carried out in vitro on segments of small intestines of rabbits. In vivo tests on dogs were then performed and it was concluded on the basis of the tests up to this point that the compound had an order of effectiveness similar to that of atropine, which is a potent antispasmodic widely used as the standard in antispasmodic testing. A standard test for determining toxicity was next conducted on mice, which indicated relatively low toxicity. Further experiments were performed to determine the effects of the drug on unanesthetized dogs and cats.

"Similar tests with the compound of count 1 were carried out and indicated an activity of the same order as the compound previously discussed.

\* \* \* \* \* \*

"The record fails to show that the compounds in issue were ever tested in humans, either for toxicity or as a therapeutic drug."

Since Blicke made each of the compounds in issue prior to the date to which Treves is restricted, he was properly held by the board to be the first to conceive. It was further held by the board that if Blicke's work in 1948 did not constitute a reduction to practice then he had not shown diligence in reducing to practice. That holding is not challenged in Blicke's brief or notice of appeal, and is clearly in accord with the record, consequently, the question of diligence is not controlling here.

It follows that the issue here is whether Blicke's work in 1948 amounted to a reduction to practice. That question resolves itself into two parts; namely, whether the making of the compounds in issue, without testing, is sufficient to establish a reduction to practice; and, if tests are necessary, whether those carried out by or on behalf of Blicke in 1948 were sufficient.

In support of his contention that the making of the compounds in issue, without testing, is sufficient to effect a reduction to practice, appellant relies primarily on the decision of the Supreme Court of the United States in Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 387, 72 L.Ed. 610; 1928 C.D. 253. That case involved a patent to one Morris L. Weiss, containing claims for a method of treating rubber and for a vulcanized compound of rubber, which claims were held by the Court to be unpatentable in view of the early work of a Dr. George Kratz. In finding Kratz to be the first inventor, the Court said:

"A process is reduced to practice when it is successfully performed. A machine is reduced to practice when it is assembled, adjusted and used. A manufacture is reduced to practice when it is completely manufactured. A composition of matter is reduced to practice when it is completely composed. Walker on Patents, § 141a; Hunter v. Strikeman, 13 App.D.C. 214, 226; Mason v. Hepburn, 13 App.D.C. 86, 92; Lindemeyr v. Hoffman, 18 App.D.C. 1, 5; Roe v. Hanson, 19 App.D.C. 559, 564."

It is to be noted that so far as the quoted statement relates to the necessity of tests it is dictum since the court found that the Kratz product had been tested.

This court has repeatedly considered the Corona decision in connection with the question whether a composition of matter has been reduced to practice, and has held that it cannot be taken as holding that the mere production of such a composition, without testing, is always sufficient for that purpose. Kyrides v. Bruson, 102 F.2d 416, 26 C.C.P.A., Patents, 986; Chittick v. Lyons, 104 F.2d 818, 26 C.C.P.A., Patents, 1382; Muskat v. Schmelkes, 140 F.2d 984, 31 C.C.P.A., Patents, 837; Kvalnes v. Wright, 183 F.2d 193, 37 C.C.P.A., Patents, 1147; and Morway v. Bondi, 203 F.2d 742, 40 C.C.P.A., Patents, 917. In the Kyrides case [102 F.2d 419] it was held that tests of the particular composition of matter involved were not necessary, but that holding was based on the ground that the composition was "of admitted utility," and that "If the ester was formed, it was known to have utility as a plasticizer." The implication is clear that, except for the known utility, tests would have been held to be necessary.

■■ It is true that in most of the cases cited above, the claim to the compound contained a statement as to its intended use, such as a dye, lubricant, or soap, whereas the instant counts do not include such a statement. However, we do not think that difference is necessarily

controlling here. A composition of matter cannot be a patentable invention unless it has utility. In re Bremner, 182 F.2d 216, 37 C.C.P.A., Patents, 1032. Accordingly, the invention of such a composition is not complete unless its utility is either obvious or is established by proper tests, regardless of whether the claims contain any specific reference to utility.

■ As this court has repeatedly stated, whether a composition of matter must be tested in order to establish a reduction to practice, and if so, what tests are necessary, is a question which must be decided on the basis of the facts of the particular case involved. Payne v. Hurley, 71 F.2d 208, 21 C.C.P.A., Patents, 1144; St. Pierre v. Harvey, 233 F.2d 337, 43 C.C.P.A., Patents, 918.

In the instant case both the application of appellant and the patents of appellee state that the compositions in issue are antispasmodic agents, and that is the only use set forth by appellant in his specification. Appellant urges that such compositions are of a kind known to be antispasmodics and that, by analogy to Kyrides v. Bruson, supra, it should be held that no tests were necessary. However, the utility which was held to be known or obvious in the Kyrides case was that of a plasticizer, which is quite different from an antispasmodic or other pharmacological material. That distinction was specifically made in the Kyrides decision, as shown by the following quotation:

"Counsel for Kyrides also relies upon the case of Reichel v. Dorset, 49 App.D.C. 198, 262 F. 652, which related to a new substance, hog cholera globulin. The Court of Appeals of the District of Columbia held that without a test of its potency in immunizing a hog, the invention could not be considered to have been reduced to practice. This case is easily distinguishable for the reason that while the material there was a new substance, it could not possibly be determined whether it would have any effect whatever on a hog until a test had been made."

It is evident that, while the antispasmodic properties of a new material might be reasonably deduced from its similarity to known antispasmodics, they could not be foretold with certainty; and that fact is apparent from the record here which shows that appellant and his associates subjected the new material to very extensive tests.

For the reasons given, we hold that the instant compounds are not of such a nature that they were reduced to practice merely by making them. It remains to be considered whether the tests carried out by or on behalf of appellant were sufficient to effect a reduction to practice.

As noted above, neither of the counts specifies any use for the claimed compounds. While that fact alone does not eliminate the necessity of showing that the compounds have some utility, it does have a bearing on the kind of utility which must be shown. It has been held that where an interference count does not specify any particular use, evidence proving substantial utility for any purpose is sufficient to establish reduction to practice. Potter v. Tone, 36 App.D.C. 181; 1911 C.D. 295; Wilson v. Sherts, 81 F.2d 755, 23 C.C.P.A., Patents, 914.

This court has held in several cases that it may be proper, in determining what tests are necessary to constitute a reduction to practice, to take into consideration statements in the specifications of the applications as well as limitations appearing in the counts of the interference. Landon v. Ginzton, 214 F.2d 160, 41 C.C.P.A., Patents, 950, and cases cited. But no case has been cited, and we have found none, holding that where an interference count merely calls for a composition of matter without specifying a particular use, it is necessary, in order to prove a reduction to practice, to establish the utility of the composition for a specific purpose which not only is not included in the count, but which is not expressly mentioned in the specifications of the applications involved.

In its decision, the board stated that "The only field of utility here disclosed is human therapy." In our opinion, that conclusion is not supported by the facts of record. It is apparently based on the testimony taken on behalf of Blicke which indicates an intention to use the compounds defined in the counts in human therapy if they were shown to be satisfactory for that purpose. However, the facts are that neither the Blicke application nor the Treves patent make any mention of human therapy. The application merely states that the compounds described "are useful in the form of their water-soluble non-toxic salts as antispasmodic agents," while each of the patents describes the compounds as "having mydriatic activity" and as being "further valuable as antispasmodics." Webster's New International Dictionary, 1949, defines "antispasmodic" as "having a sedative effect on the nervous system; preventing or allaying spasms or convulsions." The same authority defines "mydriatic" as "causing dilation of the pupil." Neither definition is limited in terms to therapy or to effects on human beings as distinguished from other animals.

Not only do the application and patents fail to refer expressly to human beings, but each does refer expressly to animals or animal organisms. Thus Blicke's specification advises that "The acids which can be used to prepare acid-addition salts are those which produce when combined with the basic esters, salts whose anions are relatively innocuous to the *animal organism* in therapeutic doses of the salts, so that the beneficial physiological properties inherent in the basic esters are not vitiated by side-effects ascribable to the anions." (Italics ours.) The quoted language seems clearly to refer to animals broadly rather than to human beings specifically.

Similarly, the specification of each of the Treves patents, after asserting that the compounds disclosed are mydriatic agents, states that they were "tested in the rabbit eye and found to possess my-

driatic activity." The results of the tests on rabbits are set forth in some detail, but nothing is said about tests on human beings. The inference seems clear that the patentee regarded tests on animals as sufficient to show that the compounds had the utility claimed for them, and since the examiner presumably accepted the application as conforming to the statutory requirements as to utility, he was apparently of the same opinion.

As pointed out in appellant's brief, the utility alleged is of a pharmacological nature as distinguished from the actual curing of a disease. Accordingly, when the production of the desired pharmacological effect, without objectionable after effects is shown, utility is sufficiently established. We find nothing in the record to require a holding that such effect must be established by tests on human beings as distinguished from animals.

■ Here, Treves is relying for his constructive reduction to practice on applications which do not specifically mention human therapy, but merely state that the compounds disclosed are useful as mydriatics and antispasmodics, and, as evidence of such utility, describe tests on animals only. Having been granted patents on the basis of such disclosures, we fail to see that he is in a favorable position to argue that Blicke must show actual tests on human beings in order to establish an actual reduction to practice.

Treves also questions the sufficiency of the Blicke tests on animals on the ground that the ultimate effect on said animals was not sufficiently established. While it appears that in some instances the animals were destroyed immediately after the tests, it also appears that dogs which were tested with the compounds while in an unanesthetized condition, and cats which had been used in mydriasis experiments, were kept until they had recovered and then turned over to the laboratory for any other experiments which might seem desirable. This was evidently in accordance with normal laboratory procedure, and appears to be sufficient to establish that the compounds had no dangerous toxic effect.

■ Treves further contends that since Blicke did not file his patent application for almost three years after his 1948 tests, such tests were no more than abandoned experiments. While it is true that a long delay in applying for a patent after allegedly successful tests have been made is a factor to be considered in evaluating the tests, it is by no means conclusive. Hedenskoog v. Backus, 48 F.2d 408, 18 C.C.P.A., Patents, 1065. It is to be noted that Blicke's application was filed before either of the patents to Treves was issued. There is nothing in the record to show that the filing of the application was inspired by knowledge of another's activity, as was the case in Mason v. Hepburn, 13 App.D. C. 86, cited by appellant. In the instant case the evidence that Blicke's tests on animals were successful is sufficiently clear to rebut any presumption of failure which might arise from his delay in filing his application.

■ We are of the opinion that the record amply establishes tests by or on behalf of Blicke prior to either of the record dates to which Treves is restricted. Those tests were of such a nature as to prove that the compounds in issue had a definite antispasmodic effect upon animals and were not seriously toxic, and we conclude those tests are sufficient to establish a reduction to practice of the invention in issue. It is, accordingly, unnecessary to consider whether the tests were sufficient to show that the compounds had utility in human therapy.

For the reasons given, the decision of the Board of Patent Interferences is reversed, and priority of invention of the subject matter in controversy is awarded to Blicke.

Reversed.

JACKSON, J., retired, recalled to participate in place of COLE, J.

O'CONNELL, J., was present at the argument of this case, but, because of illness, did not participate in the decision.