47 CCPA

**William C. ELMORE, Appellant,**

v.

**William F. SCHMITT, Appellee.**

**Patent Appeal No. 6536.**

United States Court of Customs
and Patent Appeals.

May 10, 1960.

Fidler, Beardsley & Bradley, Charles H. Beardsley, Chicago, Ill., (Raymond E. Fidler, Chicago, Ill., of counsel), for appellant.

Morton C. Jacobs, Philadelphia, Pa. (William D. Hall, Washington, D. C., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Patent Interferences of the United States Patent Office awarding priority of invention of the subject matter at issue in interference No. 87,611 to William F. Schmitt, the junior party. The invention is defined in two counts, of which Count 1 is representative and reads:

"1. A binary counter comprising a core of magnetic material exhibiting a substantially rectangular hysteresis loop, a coil wound on the said core, a source of input pulses, coupled to one end of said coil, and a capacitor coupled to the other end of said coil, whereby said capacitor is selectively charged through said coil by said input pulses and said capacitor passes a reverse discharge current through said coil between successive ones of said input pulses thereby to change selectively the operating point of said core on said hysteresis loop."

The essential features of the invention pertinent here are accurately described in appellant's brief as follows:

"The subject matter of the interference has to do with a binary counter that comprises a core having a substantially rectangular hysteresis loop, and a winding wound on the core connected at one end to a capacitor and at the other end to a source of input pulses. The arrangement is such that the capacitor is charged, through the winding, when a pulse is applied to the winding at a time when the core is magnetized in such a direction as to impart low impedance to the winding, to cause the core to be switched to its other state of magnetization by the discharge current from the capacitor flowing through the winding; and such that when the pulse is applied to the winding at the time when the core is magnetized in the opposite direction to impart relatively high impedance to the winding, such input pulse will switch the core in the opposite direction without significantly charging the capacitor. Thus, large and small voltages across the capacitor are produced alternately, depending upon the state of the remanent flux in the core."

The load to be actuated by the counter takes the form of a resistance connected in parallel with the capacitor. The exact nature of that load in practice would necessarily depend on the specific nature of the device to which the counter is applied. Although it appears from the record that counters of the instant kind may be used in various devices such as computers, radar equipment, Geiger counters and television circuits, neither party has disclosed in detail any application

1. United States Senior Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge* *O'Connell*, pursuant to provisions of Section 294(d), Title 28 U.S.C.

of the claimed counter to a specific device.

■ The senior party, Elmore, filed his application December 3, 1952. His preliminary statement alleges no date of invention earlier than July 1952. The junior party, Schmitt, filed his application June 4, 1954, which matured into patent No. 2,713,675, containing the claims in issue, on July 19, 1955. Schmitt claims to have reduced the invention to practice in April or May of 1952. His record reflects no evidence of activity in connection with the invention between the latter date and December 3, 1952, when Elmore's application was filed. Accordingly, if Schmitt did not reduce the invention to practice in April or May, 1952, he cannot prevail, even if Elmore be restricted to his filing date, since there is no evidence that Schmitt was diligent throughout the critical period. On the other hand, if Schmitt did reduce the invention to practice as early as May 1952 he is entitled to priority, since that date is prior to the earliest date alleged by Elmore. It is thus unnecessary to consider Elmore's proofs and, as stated by the board, the sole issue to be determined is whether Schmitt's proofs establish an actual and sufficient reduction to practice as of April or May 1952. The board found Schmitt's proofs sufficient and awarded him priority.

It does not appear to be disputed that a device embodying Schmitt's invention, and so constructed as to satisfy the requirements of the counts, was subjected to certain tests by one William F. Steagall, an associate of Schmitt, in April and May 1952. Those tests were of a "bench" or laboratory nature, and did not involve the use of the invention in a computer or other device having practical application. Impulses were applied by a pulse generator, and the resultant wave form appearing at the junction of the coil and capacitor was examined by means of an oscilloscope.

Steagall testified that he conducted a number of experiments in which pulses were supplied by two different pulse generators, and that a resistance was used to simulate the load. In explaining why he used that particular resistance, Steagall testified:

"A counter is not very useful unless it can supply some output. Now, this resistor connected across the capacitor is a load to which this counter supplies an output pulse. That resistor might be the grid resistor of a vacuum tube amplifier stage following the counter or it might be some other load. In any event, the resistor is there to show that output power being taken from the counter."

Steagall's experiments also involved the use of different capacitors, different resistances, and different pulse rates, including both regularly and irregularly applied pulses. It does not appear to be controverted that, *so far as the tests went,* their results were satisfactory. It also appears to be conceded that oscilloscope tests of the kind performed by Steagall are of recognized value in the art and, in some respects, probably afford a better indication of the properties of the device tested than would be given by normal use in a practical apparatus.

On the other hand, we agree with appellant that the record does not show that any one of the various tests employed by Steagall duplicated the conditions which would normally be encountered in a practical application of the invention in issue with respect to the resistance and character of load, nature of pulses, including voltage, duration and amplitude, and amount of capacitance used. Neither is it shown that the tests accurately reproduced the conditions of temperature, vibration, or sustained operation which would usually be encountered in a specific use.

■ The question of sufficiency of laboratory tests to establish a reduction to practice has frequently been considered by this and other courts. Undoubtedly the general rule, as stated by the board in the instant case, is that "A party seeking to prove actual reduction to practice must show that his invention worked as intended to work in its prac-

tical contemplated use." Gaiser v. Linder, 253 F.2d 433, 45 CCPA 846; Kruger v. Resnick, 197 F.2d 348, 39 CCPA 994, and cases there cited.

Determination of the sufficiency of laboratory tests to effect a reduction to practice must necessarily depend on the circumstances of the particular case under consideration including, *inter alia*, the simplicity or complexity of the device involved and the nature and character of the laboratory tests, as well as the conditions to which the device is subjected when in practical use. The issue here is not whether it might be possible to reduce the invention to practice by laboratory testing, but whether the particular tests made by Steagall were sufficient for that purpose.

As pointed out, the record fails in a number of particulars to show that Steagall's tests accurately reproduced the operating conditions which would be encountered in *any practical use* of the invention. In our opinion, the record does not support appellee's argument that those particulars are of no consequence. No doubt the laboratory tests and their results were of an encouraging nature and may have justified a prediction that the invention would probably be successful if and when it was put to some specific practical use; but reduction to practice requires more than that. What is required is not a mere basis for prediction but an actual demonstration. As sated in Robinson on Patents (1890), Section 127:

> "Moreover, the law demands, for the completion of the inventive act, that the art shall be so practiced, or the article of manufacture so tested, that its efficacy and utility are fully demonstrated. 'Reduction to practice' means 'reduction to successful practice.' Experiments in the direction of the desired result are not such reduction, no matter how nearly they approximate that end. The work of the inventor must be finished, physically as well as mentally."

Steagall testified that not long prior to the taking of his testimony his company had delivered a computer constructed of circuits which had been tested in the same manner as the device in issue, and that the computer was found to operate without difficulty. He also stated, however, that the computer was tested after it was assembled and that he would recommend no system for production in large volumes without having first constructed the complete system.

It is contended by Schmitt that the counter is a device having general utility and that it is sold as a separate unit. It does not follow, however, that tests of the counter alone, apart from any specific practical device, are sufficient to reduce it to practice. Spark plugs and tire chains are commonly sold as separate articles of commerce, but it has been held that they require testing under conditions of actual use to effect a reduction to practice. Payne v. Hurley, 71 F.2d 208, 21 CCPA 1144; St. Pierre v. Harvey, 233 F.2d 337, 43 CCPA 918. The device in issue is not made or sold with the idea of using it *alone*, but as part of some practical apparatus, and until it has been shown by actual tests to meet the conditions normally encountered in at least one such use, it is not, as a matter of law, actually reduced to practice.

It is also argued on behalf of Schmitt, and no doubt it is true, that tests such as those employed by Steagall are commonly used in the counter art. Such tests give much useful information as to the properties of the counter, and would normally determine whether to proceed further with it; but since the tests were not shown to accurately duplicate actual working conditions in practical use, we think they are insufficient to establish reduction to practice with the required degree of certainty.

Schmitt also contends that the Steagall tests involved a practical application of the counter, since the counter operated to produce one output pulse for every two input pulses. It does not appear,

however, that such operation had any practical value except to test the counter itself.

 Finally, Schmitt urges that Elmore has not indicated any express requirement of a counter in its ultimate use which was not met by the conditions of Steagall's tests. However it was incumbent on Schmitt, since he was relying on laboratory tests and seeking an exception to the general rule that tests under actual working conditions are necessary, to show affirmatively that the tests duplicated the essential conditions of some practical use. We do not think that has been done.

We have carefully considered the record in light of the arguments ably advanced on behalf of Schmitt, together with the decision of the Board of Patent Interferences, but are unable to agree that Schmitt's device was sufficiently tested to establish an actual reduction to practice.

The decision is reversed.

Reversed.