50 CCPA

**James HARDING, Appellant,**

v.

**Samuel STEINGISER and Ival O. Salyer, Appellees.**

**Patent Appeal No. 6893.**

United States Court of Customs and Patent Appeals.

June 20, 1963.

Watson, Leavenworth, Kelton & Taggart, John T. Kelton, New York City (Paul A. Rose, Washington, D. C., and Howard K. Kothe, New York City, of counsel), for appellant.

John D. Upham, St. Louis, Mo. (F. M. Murdock and J. Russell Wilson, St. Louis, Mo., of counsel), for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

WORLEY, Chief Judge.

Harding, the junior party[1] in an interference[2] seeks reversal of the decision by the Board of Patent Interferences which awarded priority of invention to the senior party, Steingiser et al.[3]

The nature of the invention in issue is suggested by the single count, which reads:

"2. Stabilized polyethylene composition comprising a normally solid polymer of ethylene and a stabilizing amount below 0.5 percent of

---

1. Harding's application, Serial No. 465,424, was filed October 28, 1954.

2. No. 89,352.

3. Steingiser et al. filed application, Serial No. 388,689, on October 27, 1953.

4,4'thiobis (6 *tert*-butyl-meta-cresol)."

Both parties have discovered that polyethylene compositions may be stabilized by addition of small amounts of 4,4'thiobis (6 *tert*-butyl-meta-cresol) hereinafter referred to by its trade name, Santowhite Crystals. They indicate in their applications that the claimed composition has superior stability as to electrical properties.

■ Steingiser stands on his filing date. Harding, as the junior party, has the burden of proving priority by a preponderance of the evidence. The board concluded, and we agree, that the basic issue is whether Harding can establish prior reduction to practice.

The evidence on behalf of Harding describes an experimental project, said in his brief to have been "directed to finding an anti-oxidant for polyethylene electrical insulating material which exhibited better resistance to discoloring than those in use." In that project polyethylene compositions using various antioxidants were subjected to hot milling to accelerate oxidative degradation of the resin in order to determine the efficacy of the antioxidants; using power factor, dielectric constant and reflectance tests as criteria for determining the effect of the degradation caused by the hot milling.

The board made certain findings of fact, which appellant does not challenge, and which we find supported by the record. Harding, assisted by one Hyer, began a series of experiments in the latter part of 1952 to find an effective stabilizer or antioxidant for polyethylene to be used as electric insulating material which would exhibit better resistance to discoloration than stabilizers then in use. Among the antioxidants tested was Santowhite Crystals, the compound called for by the count. Hyer actually prepared the compositions, which after being hot milled, were pressed into plaques. The plaques were then submitted to the

Physical Testing Laboratory (operated by the assignee of the Harding application) for power factor, dielectric constant and reflectance tests. Harding, upon receipt of the results reported to him by the laboratory, copied them into his notebook or weekly reports. As a result of Harding's work, which had been done at the request of a group of research personnel, designated the Electrical Insulating Group, Santowhite Crystals were "recommended for further trial." Griesser, who serves as a corroborating witness, was then assigned to repeat and carry forward Harding's work.

Appellant relies on Griesser's work for establishment of Harding's alleged reduction to practice. Griesser's activities commenced in March 1953 and terminated near the end of the following month. During that period he prepared three batches of polyethylene for testing; one control containing no antioxidant and two containing 0.1% and 0.2% Santowhite Crystals respectively. Each batch was milled at 160° for two hours, with samples taken therefrom after five minutes and two hours respectively. Those samples, after being pressed into plaques, were sent with a standard request form to the Physical Testing Laboratory. The test results obtained by the laboratory were recorded in duplicate on a standard form, a copy being retained in the files of the laboratory, and the original returned to Griesser. Due to space considerations, the laboratory copy was discarded after about one year. When the original form was returned to Griesser, he *copied* the results into his notebook and retained the originals for two or three years, after which time they were also thrown out due to shortage of filing space.

The board found the evidence regarding the laboratory test *results* not to be original record evidence, and held that since no person who ran the tests was called to testify, such evidence was merely hearsay.[4]

---

4. In support of that holding the board relied on Teter v. Kearby, 169 F.2d 808, 36

CCPA 706, and Schering Corp. v. Marzall, D.C., 101 F.Supp. 571.

750

In addition, the board found that the purpose of Harding's experimentation was to find suitable replacements for antioxidants then in use for electrical insulation compounds, and that:

"* * * The party Harding has not made any tests in respect to the *contemplated practical use in electrical wiring nor has he made any tests duplicating the working conditions in any other practical use.* Mere production of the composition after one or two hours of hot milling is not a basis for predicting success in some practical use in the absence of acceptable correlating data, and there are none. * * *" (Italics supplied.)

Hence, it concluded that Harding had not satisfied the requirements that a party seeking to prove actual reduction to practice must show that his invention worked as intended to work in its practical contemplated use, citing Elmore v. Schmitt, 278 F.2d 510, 47 CCPA 958.

The board went on to state:

"* * * The erratic results and the necessity for further trial show that as of March 2, 1953 (the date of Exh. 9) Harding was in the realm of uncertainty in respect to practical utility. Certainly there was no conviction of success at that time.

\* \* \* \* \*

"* * * The statement that the 'encouraging results * * * warrants further investigation for possible replacement of Br–254 in polyethylene electrical insulating compounds' speaks for itself and is not such language as to denote that the composition has been successfully reduced to practice. * * *"

It held the test results to be inconclusive, and found that the necessity for further work was recognized by Harding himself. The board concluded that the test results did not prove that the product would serve the purpose for which it was designed and that, consequently, no actual reduction to practice had been established by the evidence.

Harding supports his contention that the results are proper evidence with the following reasoning: The tests conducted by the Physical Testing Laboratory at Harding's and Griesser's requests were routine in nature; the results were copied on *temporary* laboratory report forms, from which Harding and Griesser copied them into their notebooks which are *permanent* records; the original lab reports, having served their purpose, are routinely destroyed or discarded due to space requirements; since accurate copies of the original results were made by Harding and Griesser, both of whom were available for cross-examination, the test results should be accepted as routine entries and accorded probative weight as evidence; and finally, they should be admitted under the Federal Shop Book Rule.

Harding contends further, that the test results establish an actual reduction to practice because they demonstrate to the satisfaction of the inventor and his associates that the test-compositions would perform their intended function in actual service. He also urges that the intended function for the composition was merely that it serve as insulating material; that such function was proved; and that it was unnecessary to prove the composition would serve specifically as electrical wire insulation.

In the view we take of the case, Harding cannot prevail even if all of the evidence submitted on his behalf is *assumed* to have probative value. Hence the real question becomes whether hot milling a composition consisting of polyethylene and Santowhite Crystals, followed by the testing of plaques pressed therefrom for power factor, dielectric constant and reflectance properties constitutes an actual reduction to practice of the invention in issue.

We have considered the authorities cited by appellant, but find Elmore v. Schmitt to set out the proposition of law which is controlling. We said there:

"* * * the record does not show that any one of the various

tests employed by Steagall duplicated the conditions which would normally be encountered in a practical application of the invention in issue with respect to the resistance and character of load, nature of pulses, including voltage, duration and amplitude, and amount of capacitance used. Neither is it shown that the tests accurately reproduced the conditions of temperature, vibration, or sustained operation which would usually be encountered in a specific use.

"The question of sufficiency of laboratory tests to establish a reduction to practice has frequently been considered by this and other courts. Undoubtedly the general rule, * * * is that 'A party seeking to prove actual reduction to practice must show that his invention worked as intended to work in its practical contemplated use.'" Gaiser v. Linder, 253 F.2d 433, 45 CCPA 846; Kruger v. Resnick, 197 F.2d 348, 39 CCPA 994, and cases there cited.

The first question is, therefore, what was the practical use to which appellant intended to put his invention. Though no specific limitation with respect to utility or purpose appears in the claims, it must nevertheless be considered. In Blicke v. Treves, 241 F.2d 718, 720, 44 CCPA 753, we said:

"* * * A composition of matter cannot be a patentable invention unless it has utility. * * * Accordingly, *the invention of such a composition is not complete unless its utility is either obvious or is established by proper tests, regardless of whether the claims contain any specific reference to utility.*

* * * * * *

"As noted above, *neither of the counts specifies any use for the claimed compounds. While that fact alone does not eliminate the necessity of showing that the compounds have some utility,* it does have a bearing on the kind of utility which

must be shown. It has been held that *where an interference count does not specify any particular use, evidence proving substantial utility for any purpose is sufficient to establish reduction to practice. * *"* (Italics supplied.)

We have reviewed the record in order to find substantial utility for any purpose and conclude therefrom that the intended purpose was to use the composition as *pigmented electrical wire insulation.* That conclusion is based on statements appearing in the specification, appellant's brief and testimony on his behalf.

Appellant's specification states:

"*It is an object* of this invention *to produce ethylene polymer compositions having a substantial odor, color, and electrical stability.* A further object is to provide ethylene polymer compositions capable of being heat-formed into fibers, film, sheeting, wire coatings and molded articles *characterized by substantial resistance to color change, odor development and electrical degradation. * * *"* (Italics supplied.)

We find not even an attempt to show reduction to practice based on any other use than electrical insulation. Appellant's brief describes the objects as follows:

"The work with regard to the preparation of the composition of the count and the testing of the composition resulted from a program extending from 1952 into 1953 at the then Bakelite Company (now Union Carbide Plastics Company).

"The program was directed to finding an antioxidant for *polyethylene electrical insulating material which exhibited better resistance to discoloring* than those in use. * * *" (Italics supplied.)

Harding's pertinent testimony is:

"Q24. How was color developed in the hot processing of polyethylene compounds? What has that to do with the project or your aims? A.

Well, it is desirable to have a very low level of discoloration in polyethylene compounds *especially for applications where the polyethylene compounds are to be pigmented for identification purposes as in wiring."* (Italics supplied.)

The pertinent testimony of Griesser, a corroborating witness, is as follows:

"Q14. Can you tell me the circumstances under which, to your knowledge, that project started and what connection you had with it? A. Well, up until this time—

"Q15. By 'this time' you mean what? A. 1952. The antioxidants employed in *polyethylene electrical insulating compounds* were by their nature materials which discolored the base polyethylene resin, making it difficult to have *colored formulation,* compounds, based on those same antioxidants which were reproducible from time to time and which gave acceptable good *pastel colors.* The purpose of the project was to develop a better base formulation compound, based on an improved antioxidant, one which was inherently *non-discoloring for use in this application.*

\*   \*   \*   \*   \*   \*

"Q19. What connection did you have with this project? A. It was my responsibility to develop the final product for *wire coating* application.

\*   \*   \*   \*   \*   \*

"Q21. What was your connection with it at that time? A. At that time I became acquainted with the problem we were having in manufacturing these *colored* compounds and the discoloration we were getting because our sales of *colored* materials were increasing and it became increasingly difficult for us to manufacture uniform *colors.* \*   \*   \*" (Italics supplied.)

The ultimate question, therefore, becomes whether the laboratory tests establish that the composition of poly-ethylene and Santowhite Crystals will perform successfully as pigmented electrical wire insulation. We agree with the board that it does not. No wires or cables were insulated and tested. Furthermore, the record discloses no correlation between the laboratory results and test results under actual service conditions. In the absence of either actual service tests or positive correlation between that and simulated tests, there is no way of knowing the extent to which laboratory tests for various physical and electrical properties can be said to be predictive of the performance to be expected under actual conditions of use. Hence, it is not known whether a stabilized composition, useful for any purpose, has been achieved. That is particularly true in the instant case, since wire insulating composition would contain at least one additional element, viz, the pigment, which may affect the properties of the composition.

The evidence leaves us at a loss to know to what extent, if any, hot milling will simulate the effect produced on electrical wire insulation, when used under actual service conditions.

While the laboratory tests may have indicated promise, we do not think, and appellant's testimony indicates that neither the inventor nor his associates thought, that success had definitely been established. It seems to us that the standard for reduction to practice, as established by the cases cited, requires more than has been done here.

Appellant argues that the case law controlling the present situation is Smith v. Swaine, 127 F.2d 140, 29 CCPA 973, and Schnick v. Fenn, 277 F.2d 935, 47 CCPA 1174, and that those cases in effect hold that reduction to practice is satisfactorily demonstrated by laboratory tests which render it reasonably certain that the subject matter will perform its intended function in actual service. We do not think those decisions conflict with Elmore v. Schmitt. From what we have already said, it should be apparent that appellant has not proved that it is reasonably certain that the inven-

tion will perform its intended function in actual operation. We agree with the board that appellant has failed to establish an actual reduction to practice prior to the filing date of the senior party.

The decision is affirmed.

Affirmed.

MARTIN, J., concurs in result only.

RICH, Judge (dissenting).

At the time of the inventions involved in this interference polyethylene was old, stabilizing polyethylene was old, the uses of stabilized polyethylene were well known, and the invention relates to nothing more than the new stabilizer named in the count, which reads:

"2. Stabilized polyethylene composition comprising a normally solid polymer of ethylene and a stabilizing amount below 0.5 percent of 4,4' thiobis (6 *tert*-butyl-meta-cresol)."

I will refer to the stabilizer by its trademark "Santowhite Crystals."

It is to be noted that the count specifies no use whatever for the stabilized polyethylene composition, which is nothing but polyethylene with a small amount of stabilizer in it. The sole issue before us is appellant's actual reduction to practice of the composition before appellees' filing date. The applicable law is correctly stated by the majority opinion to be:

" * * * where an interference count does not specify any particular use, evidence proving *substantial utility for any purpose* is sufficient to establish reduction to practice." [My emphasis.]. [Citing Blicke v. Treves, 241 F.2d 718, 44 CCPA 753.]

The majority fails, however, to apply that law to the facts here.

The fault I find in the majority opinion is that it confuses and confounds the kind of utility which must be shown here, under the law, with utility for a specific, narrow, commercial use of the compound, as pigmented electrical wire insulation, on which appellant's employer happened to be conducting an investigation at the time when appellant made the claimed invention.

What we are here concerned with is *not* the success of a project or program, as it was called, in the development of cable insulation being conducted by the employer, Bakelite Company, but the simple *stabilizing* of polyethylene by Santowhite Crystals for *any* use within the contemplation of appellant's patent application, no use whatever being stated in the count.

Let me reemphasize the uses contemplated by appellant as stated in his application, recognized but thereafter totally ignored by the majority. The specification states (my emphasis):

"It is an object of this invention to produce ethylene polymer compositions having substantial *odor*, *color*, and electrical *stability*. A further object is to provide ethylene polymer compositions *capable of being heat-formed into fibers, film, sheeting*, wire coatings *and molded articles* characterized by substantial *resistance to color, change, odor development* and electrical degradation"

The specification points out that unstabilized polyethylene has the disadvantage of degrading under processing temperatures of the order of 100°–300°C. It says:

"The rancid-like odor developed in heat-degraded polyethylene makes it unacceptable for use in *packaging foods, cosmetics and other products* demanding an odor-free packaging material." [My emphasis.]

The specification explains further that stabilizers (also known as "antioxidants") had been used but, while they reduced degradation, "it has been found that these antioxidants cause objectionable darkening of the polyethylene particularly on heating." Referring to a specific prior stabilizer, it is stated that "its presence in polyethylene is attended by poor color which darkens further on exposure to light and heat."

The advantages of using Santowhite Crystals as the stabilizer are stated in

the specification to include "preventing or inhibiting the usual rancid odor development and loss of dielectric [insulating] values on heating," "the absence of any color change in the polyethylene either initially or on exposure to heat or light," that it does not bloom, and that it can be colored and colored compositions do not go off shade on exposure to heat.

This does not sound to me like an invention which has utility only as *pigmented electrical wire insulation*, as indeed it is not. On review of the record, the majority concludes that *that* was "the intended purpose." That *was* the purpose of the program or project being worked on at Bakelite, but it is *not* the purpose of the invention which grew out of that program, as stated in the patent application which we have before us. When we look for *any* utility of the compositions *defined by the count*, it seems to me we must look to the utilities contemplated by the application, not just to the objectives of some workers at Bakelite on a cable insulation project. The scope of the invention described in the application is much greater. It just so happens that in going back into history to find evidence of a date of reduction to practice of the invention of the application and of the count we are led into the project, but we are not interested in the success of the project. We are interested only in when polyethylene was successfully made into a composition containing "a stabilizing amount below 0.5 percent of" Santowhite Crystals, to quote the count. We are concerned only with successful *stabilization,* for any use whatever, not as the majority says, only "as pigmented electrical wire insulation." The *uses* of polyethylene were already known. Stabilization is what had to be shown. Polyethylene is now such a common material the word is in Webster's Seventh New Collegiate Dictionary, defined as "one of various partially crystalline lightweight thermoplastics ($-CH_2 CH_2-$) resistant to chemicals and moisture and with good insulating properties that are used esp. in pack-

aging and insulation." The count, it is again noted, says nothing of pigment, electrical use, wire, or insulation. It is the invention of the count, not some other invention, that must be reduced to practice.

It will be observed that the testimony selected by the majority for quotation to support its views all relates to the success of the *program* or the *project* at Bakelite, not to the successful stabilization of polyethylene with Santowhite Crystals. This is indeed a small bit to select from over 100 printed pages of testimony which, when read as a whole, leaves not a shadow of doubt in my mind that the invention *of the count* was successfully reduced to practice in the form of molded products (test plaques, or "placs") of stabilized polyethylene composition and that the workers on the project, contrary to the opinion of the board and of the majority, were convinced of the success of that invention, though they may not yet have been satisfied with the commercial success of their cable insulating program.

A reduction to practice of the composition *of the count* can be established without proving any electrical properties of the polyethylene composition. Electrical properties are not of much importance in a squeeze bottle, an ice-cream container, or a sheet to cover a pile of cement bags or for the use as a painter's drop cloth, all common uses of films, sheeting, or molded articles of this material. The tests for dielectric constant, power factor, and light reflectancy, by some deemed to be of such complexity as to require the presence, as witnesses to be cross-examined, of the operators who made them, are not needed to decide this case. Resistance to discoloration and development of odor or the lack of it can be, and were, determined by witnesses who did testify, by visual and olfactory inspection. The corroborating witness Griesser, for example, said, "it was obvious from the milling test that there was no change in color * * *."

Four months before appellee's filing date, Harding, the inventor was suffi-

ciently satisfied with the stabilizing effects of Santowhite Crystals to request that the patent application at bar be filed. Six months before that he was satisfied that Santowhite Crystals were better for the purpose than previously used antioxidants.

The corroborating witness Griesser was more than satisfied. He said:

"We thought in any good antioxidant, really good, effective [in] stabilizing polyethylene, had to discolor by virtue of either breakdown of the antioxidant forming parts, subdivisions of the molecule or something like that. We thought it was a foreseen necessity and we found that Santowhite Crystals did not do that. That is why it was so unusual and why we wrote a patent application on this.

"I mean there are loads of antioxidants on the market available. They either provide an initial bad color in polyethylene or else if they have a good color they are not compatible or else they have poor electrical properties or else they develop color on exposure to heat, or in oxidation.

"So, that it was the furtherest from our mind that we could have both good color and highly effective stabilizing effect in one antioxidant. Well, we did find it."

The witness who was head of the Electrical Insulating Materials group at Bakelite, Smith, testified:

"Q28. At the time of April 27, 1953, what was your conclusion as to whether or not Santowhite Crystals were an effective antioxidant for polyethylene for the electrical purposes that you had in mind when the project was instituted? A. Well, *we were satisfied that we had demonstrated satisfactory technical performance here of this material as an antioxidant.* Thus, we were convinced that it was worth the additional expenditure of money and technical effort to commercialize material containing this antioxidant as an electrical material. [My emphasis.]

"Q29. Did you subsequently effect commercialization of this antioxidant? A. Yes, we did.

\* \* \* \* \* \*

"XQ50. Would the tests referred to a moment ago, namely power factor and dielectric constant on milling, color on milling, be sufficient to establish the usefulness of a polyethylene composition for other uses than the ones you have referred to, that is, other than this particular electrical use? A. Sure."

The record as a whole, merely sampled above to counteract the extracts of others, simply does not bear out the impression of dissatisfaction of the witnesses with the results of their tests, prior to the critical date of October 27, 1953, which one gathers from the board and the majority opinions. Those opinions fail to reflect what is in the record. The fact that work continued on the project of pigmented wire insulation and commercialization of polyethylene compositions in other ways is only natural in a going business and of no significance in detracting from the proof of reduction to practice.

I fully agree with appellant's statement in his brief:

"In considering the evidence here, it is necessary to *discriminate* between such demonstration of effectiveness to achieve the intended functions as will support a reduction to practice and the extensive, tedious and extremely specialized work involved in commercialization, where a new product is a substitute for a prior product then in commercial use (see Schnick v. Fenn, supra [47 CCPA 1174, 277 F.2d 935, 125 USPQ 567])." [My emphasis.]

Total failure so to discriminate has, in my judgment, led both the majority and the board to the wrong conclusion.

I am in agreement with what Judge Smith says in his dissenting opinion. Particularly, I see little relevance of

the case of Elmore v. Schmitt, which involved an electronic computer.

SMITH, Judge (dissenting).

The majority opinion reads into the single count in issue a requirement I do not find there, namely, that the invention "was for *pigmented electrical wire insulation* purposes." Since it is fundamental that the count controls the scope of the proceeding, such a requirement must be found in the count. The count, contrary to the assumption of the majority, is directed to a particular "stabilized polyethylene composition". The stated objects of the invention are "to produce ethylene polymer compositions having a substantial odor, color and electrical stability" and to provide such a polymer which is "capable of being heat-formed into fibers, film, sheeting, wire coatings and molded articles," the polymer in such uses being said to be "characterized by substantial resistance to color change, odor development and electrical degradation."

The majority bases its decision chiefly on our decision in Elmore v. Schmitt, 278 F.2d 510, 47 CCPA 958, and affirms the Board of Patent Interferences. In so applying Elmore v. Schmitt, the majority has not considered what I consider to be a determinative difference between the situation here and that before the court in Elmore v. Schmitt. In Elmore v. Schmitt the count called for "a binary counter". We held that the tests relied upon to establish a reduction to practice did not establish that the device tested was reduced to practice *as a binary counter*. Thus, in Elmore v. Schmitt, proof of the results of the "bench tests" without proof as to the relationship between such tests and the invention called for by the count, i. e., "a binary counter," was rejected as insufficient to establish a *reduction to practice*.

Here, however, a different situation prevails. The present count is directed to a particular polyethylene composition and *is not limited to any use*. The count simply defines the invention in issue as a "stabilized polyethylene composition".

Its claimed characteristics are that it consists of (1) "a normally solid polymer of ethylene", and (2) "a stabilizing amount below 0.5 percent of 4,4′thiobis (6 *tert*-butyl-meta-cresol)." The record here clearly establishes that the junior party, Harding, was the first to produce such a composition. The tests which were run tested that composition to determine whether it was "stabilized" as to color, odor and electrical stability.

The results of these tests were recorded in laboratory notebooks concerning which both Harding and a corroborating witness Griesser testified. From this testimony, I think it is clear that Harding was the first to produce a polyethylene composition in which 0.1 and 0.2 percent of 4,4′thiobis (6 *tert*-butyl-meta-cresol) had been incorporated and which was shown to be stabilized.

Whether Harding had established a reduction to practice here comes down simply to determining whether on the present record it was established that the polyethylene composition had been stabilized by the addition of "below 0.5 percent of 4,4′thiobis (6 *tert*-butyl-meta-cresol)." The tests run to check the stability of this composition were established by the testimony of appellant and Hyer, as well as Griesser. This testimony shows they employed hot milling of plaques of the stabilized polyethylene compositions in order to accelerate oxidative degradation of the resin, and determined the efficiency of the antioxidant as well as its effect on the color of the resin. The electrical properties of the resultant hot milled compositions were evaluated by a standard test (WC–64C) to determine power factor and dielectric constant. Resistance to discoloring was evaluated by means of visual observation and by means of a standard test (WC–98A) to measure the percent reflectance. As a result of these tests and other tests, both Griesser and Smith, who was Group Leader in charge of Electrical Insulating Materials, testified that in the spring of 1953 they were convinced of the efficacy of Santowhite Crystals as an antioxidant in polyethylene com-

positions and that such a composition containing Santowhite Crystals had good electrical properties with good color stability.

Thus, it seems to me the evidence here clearly establishes that compositions of the count were made and successfully tested by appellant prior to the earliest date upon which appellees rely. I think, therefore, that a proper decision here requires a reversal of the appealed decision.