Mitchell Stanley **BLICHARZ** and Gerald James Jackson, Jr., Appellants,

v.

Henry M. **HAYS**, Appellee.

Patent Appeal No. 9116.

United States Court of Customs and Patent Appeals.

May 9, 1974.

Marcus B. Finnegan, Brian G. Brunsvold, Finnegan, Henderson, Farabow & Garrett, Washington, D. C., attorneys of record, for appellants.

George J. Harding, 3rd, Smith, Harding, Earley & Follmer, Philadelphia, Pa., attorney of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

Blicharz and Jackson (Blicharz) appeal from that portion of the decision of the Board of Patent Interferences which awarded priority of count 1 of interference No. 96,557 to Hays, the senior party.[1]

## The Subject Matter

The count in issue reads (paragraphing added):

1. Granulation method, which comprises uniformly mixing substantially dry particles of a physiologically active material adapted to be ingested and being damaged at elevated temperatures with substantially dry particles of a physiologically inactive and physiologically compatible thermoplastic material which softens at a temperature below the temperature at which said physiologically active material is damaged,

heating the thus formed mixture to above the softening temperature of said thermoplastic material and below the temperature at which said physiologically active material is damaged so as to cause agglomeration of the particles of physiologically active material with the particles of the thermoplastic material and thereby forming powdered agglomerates,

and cooling the resulting agglomerates to a temperature below the softening point of said thermoplastic material so as to form a granulate which can be directly pressed into tablets wherein said particles of active material and said particles of thermoplastic material are mixed throughout the steps of heating and cooling.

The recited method requires simultaneously granulating the physiologically active material (increasing the size of the initially very small particles) and coating it with the thermoplastic material. Consequently, it is sometimes referred to as a "one-step" process to distinguish it from a prior art technique in which the active material was first granulated and then coated with wax.

## The Record

Hays took no testimony, but relied on his July 1, 1963 filing date. Blicharz took testimony and introduced evidence to prove prior actual reduction to practice. The testimony includes that of the co-inventors, Blicharz and Jackson. During the pertinent period, Blicharz worked at Lederle Laboratories of American Cyanamid on the development of an improvement on a process for making Lederle's line of "Sequels" products, which would release a medicament or active ingredient over a period of time after being ingested. Jackson was Blicharz's group leader. Also testifying was Weidenheimer, who was head of the Pharmaceutical Product Development Section in which Blicharz and Jackson worked. Other witnesses were Tiesler, Weidenheimer's immediate superior, and Butensky, a co-worker of Blicharz and Jackson.

The principal exhibits include pages from Blicharz's laboratory notebook, which had not been signed or witnessed, certain reports referring to the Sequels work, and a "Record of Invention" which had been submitted to the patent department of American Cyanamid by March 5, 1963.

For an actual reduction to practice, Blicharz particularly relies upon an experiment recorded as "D" on page 88 of his notebook dated December 7, 1962, although many related experiments are also reported therein. The notebook describes experiment D as involving mixing 800 grams of ferrous fumarate pow-

1. The involved Blicharz application is serial No. 687,070, filed November 30, 1967, as a continuation of serial No. 432,288, filed February 12, 1965. Hays is involved through application serial No. 292,062, filed July 1, 1963. Count 1 was copied, along with four other counts dependent thereon which were also awarded to Hays, from Lowry and Wurtz patent No. 3,308,217, granted March 7, 1967, on an application filed February 9, 1965. Before final hearing, judgment adverse to Lowry and Wurtz was entered for failure to take testimony.

der and 200 grams of glyceryl monosterate (Arlacel 161), placing them in an 8-inch coating pan, and heating them with a 250-watt infrared lamp. After 15 minutes of heating, Blicharz noted that the contents "looked good" and that the temperature was 64°C. He cooled and dumped the contents and found that a layer containing the original mixture had formed at the bottom of the pan. He then returned the removed material to the pan and heated it for 20 minutes at a temperature of 66°C, cooled and removed the contents again, screened out the undersized and oversized particles, and sent the material to the assay department of Lederle for analysis. The results of the assay, subsequently recorded in the notebook, showed what Blicharz testified was an excellent release rate and very good iron potency. He further considered the yield of appropriate size particles to be satisfactory "to demonstrate that we had a workable process." He showed the particles to others, including the co-inventor Jackson, and they decided to scale up the test and try the process with other active ingredients. The further tests do not require any particular description here.

Weidenheimer recalled a previous test (described in Blicharz's notebook on page 84) where Blicharz sprayed a wax solution on dry powdered ferrous fumarate to form what appeared to be a satisfactory granulate. The inventors and Weidenheimer felt that better results, including avoiding the use of an expensive solvent in the wax spray solution, could be obtained by starting with a dry mix. He testified that he witnessed the first experiment using dry powdered active material and dry powdered wax. During cross examination, he stated that he knew that he observed experiments C (an experiment similar to D, but on a smaller scale, run just prior to D) and D, reported on page 88 of Blicharz's notebook, since he had previously asked Blicharz to inform him when the experiment using dry powders was to be run.

### The Board Decision

The board held that the Blicharz record failed to establish an actual reduction to practice prior to Hays' July 1, 1963 date, setting forth several conclusions of law to support that view. It concluded first that there was nothing in the record to evince a conviction of success in the process at Cyanamid prior to the filing of the application in 1965. The board remarked that "the record is devoid of any comment by management after January 1963 relative to the Blicharz experiments." Largely on that basis, it held that "what we are dealing with here is an abandoned experiment." The board also commented that Weidenheimer, whom Blicharz principally relied upon for corroboration of the work performed in Experiment D, purportedly witnessed, in whole or in part, many other experiments conducted by Blicharz after the claimed date of December 7, 1962. It considered it "nothing short of phenomenal" that Weidenheimer, testifying from memory nearly eight years later, could distinguish Experiment D from all the others. Finally, the board expressly rejected the corroborating testimony of Weidenheimer relative to Experiment D as "unreliable since it is based solely on testimony based on his memory in 1970 as to events occurring in 1962; Weidenheimer kept no contemporaneous diary of events occurring in 1962 but his testimony is dependent wholly on his memory refreshed by examining the contemporaneous notebook pages of Blicharz, the inventor, which notebook had not been signed by Weidenheimer, as a witness or otherwise."

### Opinion

■ We are convinced from the record as a whole that Experiment D reported on page 88 of Blicharz's notebook for December 7, 1962, was performed as described with the results set forth. While it is clearly established that the notebook was assigned to Blicharz, the pages are unsigned and not witnessed. This notebook alone is not sufficient to

corroborate his detailed testimony concerning the single step process of Experiment D. However, we find significant corroborative evidence in the "Record of Invention" and the subsequently filed patent application, wherein Examples 1 of both are substantially identical to Experiment D as reported in the notebook and the figures for the assay report on release rate and iron potency correspond exactly on the three documents. As to the "Record of Invention," Weidenheimer identified his initials and those of his superior Tiesler thereon, along with the date 2/15/63, evidencing approval by two of Blicharz's superiors as of that date.

Contrary to the position of the board and arguments of appellee, we find the Weidenheimer testimony to constitute significant corroboration in other respects also. Weidenheimer's testimony that he observed Experiments C and D described on page 88 is clearly believable under the circumstances of record. Weidenheimer knew about the favorable results of his subordinate Blicharz's attempt at spraying wax in a solvent onto the powdered ferrous fumerate and granulating with heat. Being eager to simplify that process and avoid the need for the solent, Weidenheimer had discussed with Blicharz the desirability of the proposed experiment using dry materials. He had asked Blicharz to advise him when the experiment was to be run, and had expressly been so advised by Blicharz before Experiment D was performed. Moreover, Weidenheimer testified that he witnessed the entire run from beginning to end. Having left the employ of Cyanamid several years before the time he testified, he was a disinterested witness.

A charge by Hays, that Weidenheimer did not know other than through Blicharz that the materials used in Experiment D corresponded to the requirements of the count, does not indicate any significant defect in corroboration

in this case. Weidenheimer saw the materials in the coating pan and was familiar with them. He was familiar with ferrous fumerate, Arlacel 161, and beeswax as standard materials used in the "Sequels" manufacturing process and in the laboratory; furthermore, they were previously used in the spray process on which Experiment D was intended to be an improvement. Weidenheimer had no reason to doubt that the materials used were what Blicharz told him they were and Blicharz had no reason to mislead Weidenheimer as to what they were. As in Patterson v. Hauck, 341 F.2d 131, 52 CCPA 987 (1965), the question presented is whether a "simple *process,* using known materials, was or was not practiced."

Hays further urges that the granulate Blicharz made does not meet the count because it was not proven useful for making a tablet for sustained release of the physiologically active material. He bases the need for sustained release characteristics on the fact that the work of Blicharz was primarily in connection with a research program to improve Lederle's sustained release "Sequels" products. To support a sustained release requirement, Hays relies largely on Harding v. Steingiser, 318 F.2d 748, 51 CCPA 701 (1963). That was a split decision of this court where two judges joined in an opinion affirming the Board of Patent Interferences which found there was no actual reduction to practice, a third judge concurred in the result only, and the other two judges wrote dissenting opinions. However, all of the opinions accepted the proposition that "where an interference count does not specify any particular use, evidence proving substantial utility for any purpose is sufficient to establish reduction to practice." The majority opinion and that of one dissenter cited Blicke v. Treves, 241 F.2d 718, 44 CCPA 753 (1957) for that proposition. The difference in conclusions arose from the application of that proposition to the proofs.[2]

---

2. See Rimbach v. Wanmaker, 362 F.2d 561, 53 CCPA 1552 (1966) for a discussion of

the *Harding* case and a reiteration of the principle advanced in *Blicke.*

■■ In the present case, the count does not specify any sustained release properties for the granulate to be formed, and we do not think that a showing of any particular sustained release properties for the Blicharz granulate is required. We find the record to provide adequate evidence that one skilled in the art would consider the granulate in question useful for making drugs in the form of tablets not having any particular sustained release properties. The Blicharz "Record of Invention" stated that "the techniques can be used to produce granules which can be subsequently tabletted or encapsulated which do not have sustained release properties." The Lowry and Wurtz patent, from which the count was derived, describes the invention primarily without regard to producing a product having sustained release properties. The specification of that patent includes only a brief suggestion that "[l]arger amounts of thermoplastic material may be used as binder where it is desired to produce sustained release tablets." Furthermore, Hays has disclosed no sustained release data in his application—a circumstance that leaves him in a poor position to urge that a strict criterion be applied in interpreting the Blicharz reduction to practice proofs on this point.

The recent case of Knapp v. Anderson, 477 F.2d 588 (Cust. & Pat.App.1973), also relied upon by Hays, does not conflict with our view that no particular sustained release properties are required for a reduction to practice of the count here. That case also cited Blicke v. Treves, *supra*, as recognizing that proof of substantial utility for any purpose is sufficient to establish actual reduction to practice of counts which do not specify any particular use. However, the appellants in *Knapp* were held not to have established an actual reduction to practice of certain amine additives since the *only* utility contemplated for the additives had not been sufficiently demonstrated. The present facts are distinguishable from those of *Knapp* inasmuch as the record establishes that the granulate of Blicharz also has a substantial utility for making drugs in the form of tablets not having any particular sustained release properties, which utility has been sufficiently demonstrated.

■ The final basic consideration is whether Blicharz reduced to practice a method that provided "a granulate which can be directly pressed into tablets." We do not find corroborated evidence that the granulate from Blicharz Experiment D was actually pressed into tablets although granulates from other similar experiments apparently were. However, the product of the recited method is the granulate, not tablets made therefrom, and the method was reduced to practice if it is proved that the granulate could be so pressed. Weidenheimer who witnessed the entire Experiment D on notebook page 88 testified:

Q. 302.  Did he form granules that could have been pressed into tablets?

A.  Yes, they could have been used for this purpose.

Weidenheimer further testified that, other than a slowing of the release rate, there was no problem of tableting the granulates produced by the one-step process of Blicharz. Butensky, a co-worker of Blicharz not shown by the record to have testified either to witnessing Experiment D or examining its product, was asked whether the "agglomerates" resulting from other unidentified experiments by Blicharz could have been pressed into tablets. He replied that he did not know, but that it was possible they could have been so pressed. As a possible source of difficulty he noted that some of the agglomerates "might have been too large."

■ Considering the evidence as a whole, we are satisfied that a person skilled in the art would have known that the granulate of Experiment D could have been directly pressed into tablets. In connection with the standard to be used in evaluating the evidence of Blicharz on this point, it is of interest that

Hays' application discloses that the granulates (or agglomerates) produced by his process are milled in a comminuting machine before they are pressed into tablets. A party in interference relying on his application for a constructive reduction to practice is not in a favorable position to urge that his opponent's proofs of actual reduction to practice must show a greater utility than the specification relied on discloses. See Blicke v. Treves, *supra*. Butensky's feeling that possibly some of the granulates or agglomerates produced by Blicharz's experiments might be too large for tableting does not detract from the specific testimony of Weidenheimer, one skilled in the art who actually saw the granulates and was satisfied that they could be tableted.

■ Although we have already reached the conclusion that Blicharz's work connected with Experiment D did amount to an actual reduction to practice on December 7, 1962, we feel compelled to specifically reject the board's finding that the Blicharz work amounted to an abandoned experiment. The board seems to have based that finding on the view that the record is devoid of any comment on the Blicharz work by management after January 1963. However, we find that a conviction of success in the invention was demonstrated by the fact that the "Record of Invention" was promptly prepared, authorized by both Weidenheimer and his superior Tiesler, and submitted to the patent department of Cyanamid by March 5, 1963. It is true that there was nearly a two year delay in filing the application, but Weidenheimer explained that was "[b]ecause our patent attorneys were swamped then." The actual reduction to practice was accomplished before Hays' date so no issue of diligence toward a reduction to practice is involved. Likewise, the question of abandonment, suppression or concealment under 35 U.S.C. § 102(g) of an invention already reduced to practice was not raised here and is not before us, even though an express rejection by the board of "the

Hays charge of 'spurring'" indicates that matter was argued below.

Hays renews a request that Blicharz be restricted to his filing date under Rule 223(c) on the grounds that the alleged first written description and drawing of the invention set out in his preliminary statement do not actually disclose the invention of the count. The board, having previously denied the request, found no reason to discuss it in its priority opinion. We find no error in the board's handling of the request.

The decision of the board is reversed.

Reversed.